Otis GRANT, Plaintiff, Appellant,

v.

NEWS GROUP BOSTON, INC., d/b/a
Boston Herald, Defendant,
Appellee.

No. 94–2191.

United States Court of Appeals,
First Circuit.

Heard April 5, 1995.

Decided April 28, 1995.

Anthony W. Neal, with whom Law Offices of Anthony W. Neal was on brief, for appellant.

M. Robert Dushman, with whom Brown, Rudnick, Freed & Gesmer was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

In this appeal, plaintiff-appellant Otis Grant, an African–American male and a former substitute paperhandler in defendant-appellee Boston Herald's pressroom, assigns error to the district court's entry of summary judgment in favor of the Herald on his claims of discriminatory treatment, discriminatory discharge, and retaliatory discharge brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and Mass. Gen.L. ch. 151B. Grant also challenges the district court's denial of his late-filed motion to amend the complaint. While the record contains troubling evidence regarding the Herald's pressroom hiring practices, it does not support Grant's claim that the complained-of acts were prompted by racial discrimination or a retaliatory animus. Nor does it persuade us that the district court abused its discretion in refusing to allow Grant to amend his complaint. We therefore affirm.

## I.

### A. The Initial Complaint

The initial complaint made the following claims: (1) the Herald reduced Grant's hours in December 1991 and January 1992 because of his race; (2) the Herald terminated Grant as a substitute paperhandler in February 1992 in retaliation for his complaining about this reduction in hours and other alleged acts of discrimination; and (3) the Herald terminated Grant as a substitute paperhandler in February 1992 because of his race. In so characterizing the complaint, we obviously reject Grant's argument that it stated a claim that the Herald refused to promote Grant from the position of substitute paperhandler to full-time paperhandler because of his race. Nothing in the complaint even remotely intimates that this is a failure-to-promote case. *See Mack v. Great Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 183–84 (1st Cir.1989) (warning the bar that we will hold litigants to their duty "to spell out [their] theories clearly and distinctly before the nisi prius court, on pain of preclusion").

The following facts are directly relevant to the claims made in the initial complaint. Grant began working as a substitute paperhandler in November 1989, after he learned of the position from his brother Jeffrey, who is a full-time employee of the Herald. A substitute paperhandler is a part-time employee who does the same work as a full-time paperhandler—moving large rolls of newsprint, removing wrapper heads from the rolls, bringing plates from the pressroom to

the presses, and cleaning the pressroom—but works only on an as-needed basis. A substitute paperhandler does not need a high school diploma, technical vocational training, or other education. He is an at-will employee and, unlike full-time paperhandlers (who are unionized), does not have employee benefits such as paid vacation leave, sick pay, or health insurance. Of paramount concern to the Herald is a substitute paperhandler's willingness and availability to "cover the job"—i.e., to work when scheduled or called at the last minute. As Grant himself admits, there is an expectation that substitutes will "never say no" and that they will show up at work "dead or alive."

The Herald has several methods of notifying substitute paperhandlers to come to work. If the pressroom superintendent, Robert Reilly, knows in advance that he will need substitutes, he posts a list—the "work list"—of the substitutes who are scheduled to work each day of a particular week. Sometimes, he includes next to the work list a "next list," which contains the names of those substitutes who will be called at the last minute if a previously scheduled fulltime or substitute paperhandler is absent. Also, substitutes are told that if they want work, they should call the Herald before the beginning of a shift to see if there are any openings.

Grant had two tenures as a substitute paperhandler at the Herald. The first, which lasted from November 1989 through April 1990, ended when Reilly terminated Grant's employment after a fight with a full-time, white co-worker, Joseph Gauthier. During the course of this altercation, Gauthier subjected Grant to racial slurs and spat in his face. Although Reilly fired Grant, he only suspended Gauthier. The Herald explains this differential treatment in two ways. First, Gauthier, as a union member, could not be terminated without cause, and was entitled to certain pre-termination procedures set forth in the collective bargaining agreement. Second, Reilly allegedly had warned Grant a few times about failing to cover the job, and viewed Grant's involvement in the altercation as "the last straw."

Subsequent to his April 1990 termination, Grant went to the Massachusetts Commission Against Discrimination ("MCAD") and charged the Herald with racial discrimination. On January 11, 1991, Grant and the Herald settled this charge. As part of the settlement agreement, the Herald restored Grant to the substitute paperhandler list and paid him a sum of money. In return, Grant agreed to release the Herald from all claims arising out of his employment to that point in time. Grant returned to his former position on January 14, 1991.

Although Grant always performed his duties well, his ability and willingness to cover the job were consistently at issue. From January 1991 through December 1991, there were nine occasions on which Grant was scheduled in advance to cover a shift but failed to come to work. Without notice, Reilly discontinued using Grant as a substitute in December 1991. When Grant inquired as to why he was no longer getting any hours, Daniel Messing, a pressroom supervisor, informed him that no substitutes were getting any hours. Grant then checked the work lists and discovered that, in fact, two white substitute paperhandlers were working. Grant thereafter requested a meeting with Reilly and, on January 21, 1992, Grant and Reilly convened to discuss Grant's work status. At that meeting, it was decided that Grant would be put back on the substitute list. Grant worked nine times in the next few weeks, but then failed to appear on February 12, 1992 and called in sick on February 20, 1992. By letter dated February 21, 1992, Reilly informed Grant that he would be removed from the list of substitute workers. Although Grant labors mightily to circumvent or obscure some basic facts, the record reveals: (1) no other substitute paperhandler failed to cover an assigned shift more frequently than Grant during the period from January 1991 through February 1992; (2) Grant often failed to work when his name was on the next list during this same period; (3) the two white substitute paperhandlers with job-coverage records most similar to Grant's (and to whom Grant compares himself in making his disparate treatment argument) were terminated in the fifteen months following Grant's termination for failing to cover the job; and (4) many other substitute

paperhandlers were terminated over the years for failing to cover the job.

## B. The Proposed Amended Complaint

Grant sought to add to this case, via the amended complaint, the following claims: (1) the Herald refused to promote Grant to the position of full-time paperhandler because of his race; (2) the Herald engaged in unlawful retaliatory behavior beyond terminating him; (3) the Herald engaged in unlawful employment practices which have had a disparate impact on qualified African Americans and qualified Hispanic Americans as classes; (4) the Herald engaged in an unlawful, race-motivated pattern and practice of hiring, promoting, disciplining, and terminating its substitute and full-time paperhandlers; and (5) the Herald denied Grant the right to make and enforce contracts and to enjoy all the benefits of a contractual relationship enjoyed by white citizens.

The following facts are directly relevant to the new claims. Grant asserts that they also constitute indirect evidence of the claims set forth in the initial complaint. In 1989, at the time of Grant's initial hiring, Grant was one of only two African–American employees working in the Herald's pressroom. The other was his brother Jeffrey, from whom he learned about the position. During that same year, there were a total of 147 employees in the Herald's pressroom. The Herald has not hired a full-time, African–American pressroom employee since February 1987. From 1989 through the present, a period during which the number of pressroom employees has ranged from 129 to 165, there has been only one full-time African–American employee. During this same period, there have been no African–American pressroom supervisors.

African Americans constitute 18.69% of those in the local labor market having the requisite skills for the job of paperhandler. Despite this fact, from December 1989 through April 1994, the Herald hired at least twenty-three white substitute paperhandlers and no African Americans. During the same time period, the Herald promoted eight or more white substitute paperhandlers, and no African–American substitute paperhandlers,

to full-time status. There are no women working in the Herald's pressroom.

Robert Reilly—the pressroom superintendent—has been solely responsible for the promotion, discipline, and discharge of all substitute paperhandlers since 1989. He also has been solely responsible for hiring full-time paperhandlers. By his own admission, Reilly maintains no written criteria governing the discipline and termination of substitute paperhandlers. Reilly maintains that "covering the job" takes precedence over seniority in decisions regarding whom to promote to full-time status. At least twice—in April 1990 (shortly after Grant was terminated for fighting with Joseph Gauthier) and October 1991—Reilly promoted white substitute paperhandlers with less seniority than Grant. Earlier in 1991, Grant had protested to Reilly that the latter of these two paperhandlers was racist because he and a co-worker left Grant a disproportionate share of the workload. Reilly had not seen any merit in Grant's protest. After the October 1991 elevation of the white co-worker, Grant complained to a union representative about his not yet having been promoted to full-time status. Grant asserts that this complaint not only failed to bear fruit, but that it also resulted in the December 1991–January 1992 reduction in hours he experienced.

The only written criterion Reilly considered in determining whom to promote was the substitute paperhandler's initial employment application. This application requests, *inter alia*, that the applicant list all friends and relatives employed by the Herald. The white substitute paperhandler promoted in October 1991 had listed four relatives and friends on his employment application; Grant had listed one. Reilly admits that word-of-mouth communication and nepotism heavily inform who learns about available substitute paperhandler positions (which are neither advertised nor posted). Grant maintains that the same factors inform the promotion of substitute paperhandlers to full-time status.

## C. Procedural History

On July 13, 1992, Grant filed an MCAD/EEOC charge against the Herald and the

Boston Newspaper Printing Pressmen's Union No. 3 (the paperhandlers' union). The charge alleged that the Herald retaliated against Grant and terminated his employment because he is an African American; it further alleged that the union excluded him from membership and otherwise retaliated against him because of his race. On April 29, 1993, with the permission of the MCAD, plaintiff initiated this action in Massachusetts Superior Court. The union removed the case to federal court in late May 1993. In August 1993, Grant dismissed all claims against the union.

The district court initially ordered that discovery be completed by February 28, 1994, and scheduled the final pretrial conference for March 21, 1994. The court thereafter twice extended these deadlines, eventually ordering that discovery close on May 30, 1994, and scheduling the final pretrial conference for August 3, 1994.

On July 13, 1994, Grant served and filed his motion to amend the complaint. The amended complaint increased by eighty-seven the number of allegations in the "Facts" section. It also added the five new legal theories set forth *supra*. The Herald opposed this motion, and simultaneously moved for summary judgment on the initial complaint. At the pretrial conference on August 3, 1994, the court orally denied the motion to amend. On November 7, 1994, the district court granted the Herald's motion for summary judgment and denied Grant's motion for reconsideration of the order denying the motion to amend. This appeal followed.

## II.

As stated above, Grant makes two basic arguments on appeal. First, he asserts that the district court abused its discretion in not allowing him to amend his complaint so as to press the claims outlined in Section I–B. Second, he argues that the court erred in allowing the Herald's motion for summary judgment on the claims outlined in Section I–A. We discuss each argument in turn.

### A.  The Motion to Amend

■ The district court denied Grant's motion to amend for two reasons. First, the court stated that the motion was unduly late because the court was "ready now to deal with this case after discovery is complete. . . . If I allow the Amended Complaint, it brings theories into this case that are going to delay it. It is like an entirely different case." Second, the court indicated that most of the newly-added claims were futile because Grant had not presented them in the first instance to the MCAD. Because there is no reversible error in the court's lateness determination, we do not reach the question of futility.

■ We review a denial of leave to amend under Fed.R.Civ.P. 15 for an abuse of discretion, and defer to the district court if any adequate reason for the denial is apparent on the record. *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir.1994). We are mindful, however, of Rule 15(a)'s admonition that "leave shall be freely given when justice so requires." Thus, unless there appears to be an adequate reason for the denial (e.g., undue delay, bad faith, dilatory motive on the part of the movant, futility of the amendment), we will not affirm the denial. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ We also are aware that Title VII plaintiffs often lack access to statistical evidence such as the racial composition of the job applicant pool until after they have filed their complaints and engaged in discovery. For this reason, we think that a denial of leave to amend to add Title VII claims supported by statistics should be evaluated with some caution. Too casual a review of such a denial might encourage the abandonment of (or failure to pursue) potentially meritorious claims. It might also precipitate an increase in unsubstantiated pleading. *See generally* Phyllis Tropper Baumann, Judith Olans Brown, and Stephen N. Subrin, *Substance in the Shadow of Procedure: The Integration of Substantive and Procedural Law in Title VII Cases*, 33 B.C.L.Rev. 211, 289–90 (1992).

Having carefully evaluated the court's lateness determination in light of the record, we discern no abuse of discretion in this case. At the time Grant filed his motion, discovery was already complete, and Grant all but con-

cedes that it would have to have been reopened in order for the Herald to defend itself properly against the claims asserted in the amended complaint. Moreover, the Herald had nearly completed its motion for summary judgment and undoubtedly was well into its trial preparation. When these facts are considered in conjunction with the radical remaking of the case contemplated by the amended complaint, Grant's argument that the Herald would not have been prejudiced by allowance of the amendment rings hollow. *Cf. Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 4–5 (1st Cir.1983) (finding prejudice to party opposing late-filed motion to amend even where additional discovery was not necessary; the additional claims "may well have affected defendants' planned trial strategy and tactics" and would likely have "required additional time to prepare for trial").

■ Perhaps more importantly, while the slightly more than fourteen-month delay between the initial complaint and the motion to amend is not unprecedented, it is considerable, especially in view of the fact that the motion came after the close of discovery (which had already been twice extended). And we have stated: "Where ... considerable time has elapsed between the filing of the complaint and the motion to amend, the *movant* has the burden of showing some 'valid reason for his neglect and delay.'" *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir.1983) (quoting *Hayes v. New England Millwork Distribs., Inc.*, 602 F.2d 15, 19–20 (1st Cir.1979)) (deeming a seventeen-month delay between the initiation of the action and filing of a motion to amend—served ten days *prior to* the close of discovery—to be undue) (emphasis supplied). Under this circuit authority, it is incumbent upon *Grant* to give a valid reason for having waited so long to file his motion. This he has failed to do.

Grant explains the lateness of his motion by asserting that he was "stonewalled" by the Herald in his effort to obtain documents—i.e., the Herald's EEO–1 reports—purportedly underlying the five new claims. He points out that he did not receive the EEO–1 reports until June 1994, and that he

filed the amended complaint within a month of receiving them. This explanation fails for two reasons. First, the Herald did not stonewall Grant; Grant did not request the documents until April 28, 1994. Grant's suggestion that the Herald is responsible for the late introduction of the statistical evidence derived from the EEO–1 reports is therefore unjustified.

Second, Grant clearly possessed the knowledge necessary to make the claims he sought to assert in the amended complaint even without the EEO–1 reports. Nothing in the EEO–1 reports was essential to his failure-to-promote claim, for example. Grant acknowledges as much by arguing that the failure-to-promote claim actually was included in the original complaint. And Grant cannot claim that he was unaware, prior to receiving the EEO–1 reports, of the general racial composition of the pressroom staff, the discretion the Herald invested in Robert Reilly on matters of hiring and promotion, the lack of written criteria to guide hiring and promotion decisions, the nepotism that pervaded the Herald pressroom's hiring practices, or the identity of those persons actually promoted to full-time status during Grant's periods of employment. This simply is not a case where the plaintiff could not, without risking sanctions, have pleaded the late-added claims until after, or at least well into, the discovery process. Grant was aware, or should have been aware, of information tending to support each of the new claims well before July 1994. *Cf.* Baumann *et al., supra,* at 289–96 (discussing the danger Fed.R.Civ.P. 11 poses to Title VII plaintiffs who do not plead carefully).

For all these reasons, the district court did not abuse its discretion in denying Grant's motion to amend the complaint on lateness grounds.

### B. The Motion for Summary Judgment

The court granted the Herald summary judgment on Grant's claims. In so doing, the court ruled that the Herald had articulated a legitimate, non-discriminatory and non-retaliatory reason for Grant's termination, and that Grant had failed to demonstrate a triable issue as to whether the Herald's justifi-

cation was pretextual. Although the court's analysis overlooked one of Grant's claims—i.e., that the reduction in hours Grant suffered in December 1991–January 1992 was motivated by racial discrimination—we see no error in the award of summary judgment.

■ There is no dispute over whether Grant has made a prima facie case of racial discrimination or whether the Herald, by pointing to Grant's excessive absenteeism and unavailability for work, has articulated a legitimate, non-discriminatory and non-retaliatory reason for Grant's termination. *See generally Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259–60 (1st Cir.1994) (summarizing the first two stages of the burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and applicable in Title VII cases); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 827 (1st Cir.1991) (noting the applicability of the *McDonnell Douglas* paradigm in retaliation cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Nor can there be any dispute that, in order to escape summary judgment under federal and state law, Grant must *at least* introduce sufficient evidence to permit the factfinder to infer that the Herald's stated reason for the termination was pretextual. *See Woods,* 30 F.3d at 263 (noting the immateriality of the now-established difference between federal and Massachusetts discrimination law where the plaintiff has not offered enough evidence for the factfinder to infer pretext); *Greenberg v. Union Camp Corp.,* 48 F.3d 22, 29 (1st Cir.1995) (plaintiff making retaliation claim must show that employer's stated reason for the adverse action is pretextual) (citing *Mesnick,* 950 F.2d at 827). Thus, we restrict our inquiry to whether the district court correctly concluded that the evidence, construed in the light most favorable to Grant, would not allow a factfinder to conclude that Grant's race or a retaliatory animus on the part of the Herald was a motivating factor in Grant's termination. We believe that the district court's conclusion was correct.

We point out that the Herald has done more than articulate a reason for Grant's termination; it has introduced significant evidence tending to establish the reason's veracity. Not only does the documentary evidence confirm that, during the relevant time period, Grant had the poorest overall record for covering the job of any of the Herald's substitute paperhandlers, it also indicates that Reilly subsequently terminated the two white co-workers with the most similar job-coverage records—the co-workers to whom Grant compares himself in making his disparate treatment argument—for failing to cover the job. The evidence also reveals that many other substitute paperhandlers were terminated over the years for failing to cover the job. In light of the evidence of the Herald's refusal to abide substitute paperhandlers who fail to cover the job and Grant's very poor job-coverage record, Grant faces a formidable hurdle in arguing that the Herald's stated reason for his termination was pretextual.

Grant seeks to support his pretext argument in three specific ways. First, he points to the statistical evidence summarized in Section 1–B, arguing that it is indirect proof of Reilly's discriminatory animus. Next, he recites three allegedly discriminatory actions taken by Reilly, again arguing that they constitute indirect evidence of Reilly's discriminatory animus. Third, he asserts that he was treated differently than two white co-workers with "similar or worse attendance records from January 6, 1991 through February 21, 1992." We already have rejected the last of these three arguments. It bears repeating that the record, read in the light most favorable to Grant, conclusively establishes that Grant failed to cover the job more often during the relevant time period than the two (subsequently terminated) co-workers to whom he compares himself.

■ We therefore focus on Grant's first two arguments, disregarding other arguments made only in Grant's reply brief and/or which fall outside the parameters established by Grant's complaint. *See, e.g., Sandstrom v. Chemlawn Corp.,* 904 F.2d 83, 86 (1st Cir.1990) (deeming waived an argument not made below or in appellant's opening brief); *Mack,* 871 F.2d at 183–84 (emphasizing that unpleaded claims and theories will be subject to preclusion). We note in pass-

ing, however, that, had they been properly preserved, these arguments would not have affected our conclusion that summary judgment was correctly entered for the Herald.

■ As we have stated, Grant's statistical evidence does paint a disturbing picture of the Herald's pressroom hiring practices and their possible effects. It is apparent that qualified African Americans are significantly underrepresented in the Herald's pressroom. Moreover, Robert Reilly concedes that word-of-mouth communication and nepotism play a large role in determining who learns about and obtains available paperhandler positions. Finally, in response to an inquiry posed at his deposition, Reilly, who enjoys nearly unfettered discretion over pressroom hiring, expressed little or no concern about the exclusionary effect these facially-neutral practices might be having on potential applicants of color. We think it important for the Herald to recognize that the facial neutrality of such hiring policies does not necessarily take them outside the reach of Title VII. *See EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 606 (1st Cir.1995) (" '[W]hen the work force is predominantly white, nepotism and similar practices which operate to exclude outsiders may discriminate against minorities as effectively as any intentionally discriminatory policy[.]' ") (quoting *Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 925 (4th Cir.1990)) (evaluating disparate impact claim).

The fact of the matter is, though, that we are not evaluating a disparate impact, or a failure-to-hire, or even a failure-to-promote claim; we are considering whether a rational jury could find, by a preponderance of the evidence, that the Herald is lying when it says that it terminated Grant because of his failure to cover the job (and *not* because of his race or his engagement in statutorily-protected activities). In our view, Grant's statistical evidence—whether considered alone or in conjunction with the other evidence we will discuss *infra*—is not a sufficient foundation upon which a jury could premise such a finding. While the evidence does tend to show that the Herald's hiring policies, as implemented by Robert Reilly, operate to exclude African Americans from the hiring pool, and while it may allow for a reasonable inference that the Herald and Reilly are insensitive to the need to provide fair and equal access to its pressroom employment opportunities, it is inadequate to prove that Reilly takes race into account (or, for that matter, that Reilly takes participation in protected activities into account) when he makes discharge decisions. Along these lines, we note that Grant's brother obtained full-time status and apparently still works at the Herald. More to the point, this evidence in no way undercuts the Herald's evidence that a willingness and ability to cover the job is the foremost quality sought in substitute paperhandlers, and that Grant and others who lacked this quality were terminated precisely because they lacked it.

Grant's second argument, that three allegedly discriminatory actions taken by Reilly prove illicit motive in Grant's termination, also fails. We do not think that two, if not all three, of the delineated actions could reasonably be considered discriminatory. And even if they could be so considered, we do not believe that they are sufficient to call into question the non-discriminatory and non-retaliatory explanation the Herald has given for Grant's termination: that Grant was not covering the job.

The first of the three actions Grant points to—that Reilly fired Grant while only suspending Joseph Gauthier after their April 1990 fight (and shortly thereafter promoted a white substitute with less seniority than Grant to full-time status)—is at least plausibly explained by the fact that Gauthier, as a union employee, enjoyed greater procedural protections than did Grant, and by the allegation that Grant was already on shaky ground because of a poor attendance record prior to the fight. The second—that Reilly found unworthy of credence Grant's complaint that two co-workers were racists who gave him too much work (and that Reilly subsequently promoted one of these co-workers to full-time status)—is so sparsely explained and supported that no rational factfinder could find racism on Reilly's part based on the record evidence. Similarly, the third (which coincides with the claim that the district court did not explicitly consider in its

summary judgment order)—that Reilly reduced Grant's work hours in December 1991 and January 1992 because of Grant's race—is unsupported by any evidence to this effect. The fact that, during the same period, a pressroom supervisor informed Grant that no substitutes were getting any hours when, in fact, two white substitutes were getting hours is not probative of racial discrimination on Reilly's part. Daniel Messing, and not Reilly, was the pressroom supervisor who gave Grant the incorrect information, and there is no reason to infer that Messing misinformed Grant at Reilly's direction.

Because Grant has failed to demonstrate that the Herald's stated justification for the adverse employment actions of which he complains is pretextual, the district court did not err in granting the Herald summary judgment on Grant's federal and state discrimination and retaliation claims.

### III.

For the reasons stated above, we affirm the district court's entry of summary judgment in the Herald's favor. Costs awarded to the Herald.

*Affirmed.*