Katz v. NH DCYS                    CV-93-211-M    11/20/96
            UNITED STATES DISTRICT COURT FOR THE
                  DISTRICT OF NEW HAMPSHIRE


Elena Katz and Arnold D. Grodman,
Individually and as Parents and Next
Friends of Eleonora Rose Grodman,
      Plaintiffs,

      v.                                    Civil No. 93-211-M

N.H. Division of Children and Youth Services;
N.H. Department of Health & Human Resources;
Beth Anne Sargent Enriquez; Pamela Shaw; Gayle
Richards; Robert Doty; Christopher T. Regan,
      Defendants.


                        O R D E R


      Elena Katz and Arnold Grodman, on behalf of themselves and

their daughter, Eleonora Grodman, assert a number of civil rights

claims under 42 U.S.C.A. § 1983 and state tort claims arising

from the state's having taken Eleonora into protective custody.

The parties' pending motions raise significant jurisdictional

questions in addition to substantive legal issues.  For the

reasons that follow, those causes of action remaining after

ruling on the parties' motions shall be remanded to the state

court for further proceedings.

## FACT SUMMARY[1]

Elena Katz and her infant daughter, Eleonora Grodman, were living in "My Friend's Place," a shelter for temporarily homeless people, in Dover, New Hampshire, in November of 1991. Eleonora was five months old at that time. They had previously lived with Arnold Grodman, Eleonora's father, in Danville, New Hampshire.

On November 21, 1991, the Salem District Office of the New Hampshire Division of Children, Youth, and Families ("DCYF") received a report of suspected neglect of Eleonora. The source of the report was a therapist in Massachusetts whose patient, Arnold Grodman's brother, told her about possible neglect. The report was assigned a "moderate risk" level and was referred to DCYF social worker Gayle Richards. On November 25th, Richards called Lee Rollo, the program director at "My Friend's Place," to gather information about Katz's care of her baby. Rollo reported that Katz was "nuts" and was having problems caring for her daughter. Richards visited "My Friend's Place" with another social worker, Beth Anne Sargent, on November 26 to interview Katz about the reports of neglect. They met with Katz, who reluctantly brought Eleonora downstairs for the meeting, and

---

[1] The facts summarized here are taken from the parties' pleadings and are provided for purposes of background only.

2

Katz gave Richards Eleonora's pediatrician's name, address, and telephone number. Katz refused to discuss whether she was receiving psychological therapy.

Arnold Grodman arrived during the meeting and identified himself as Eleonora's father. Grodman explained that his brother, who was the source of the neglect report, was manic depressive and had gotten into verbal fights with Katz when the brother was living with them. He also explained that he visited Eleonora twice a week and had no concerns about Katz's ability to care for their daughter. Grodman gave Richards the name, address, and telephone number of Katz's former psychiatrist and asked the social workers to contact the psychiatrist about Katz's mental health. Grodman also provided his own home and business addresses and telephone numbers and asked that the social workers contact him if they had further concerns about Eleonora.

Richards contacted Eleonora's pediatrician on December 3. The pediatrician said that she had seen the baby at birth and then for a two-week visit in June 1991 when she found a diaper rash and yeast infection. She described Katz as "strange" but had not had contact with her since June.

On December 20, 1991, Rollo, of "My Friend's Place," called the DCYF office to report on Katz's activities. Richards was not

in the office, and the call was taken by Sargent.  Rollo reported that Katz had taken a turn for the worse and was having more difficulty with herself and the baby.  She reported that Eleonora was not on a schedule, that she was awake all night screaming, and that Katz was feeding the baby during the night to quiet her.  Rollo also said that Katz was at the point of breaking down from the stress of taking care of the baby.  Rollo reported that Katz had been heard making bizarre statements and had not brought the baby downstairs for a day and a half.  Rollo also reported that when she suggested that Katz get counselling Katz responded that she did not need help, that she was sleep deprived, and was considering giving her baby up for adoption.

Sargent first discussed Rollo's reports with a supervisor, Pamela Shaw, and then began to investigate the situation. Sargent talked to people at the Visiting Nurse Association, who had been providing follow-up care for Eleonora.  They reported that Katz had been complaining recently of her lack of sleep and that she was uncooperative, demanding, and antagonistic.  Sargent learned that Katz was receiving aid due to a mental disability based on a 1987 diagnosis of major affective disorder.  Sargent then called the Strafford County Guidance Center for advice.  She advised the Guidance Center of Rollo's reports and the diagnosis

4

of major affective disorder. An intake worker at the Center who had never met Katz advised DCYF to take the baby into protective custody.

Sargent then called the Dover Police Department. Two police officers were assigned to accompany Sargent to "My Friend's Place." Katz came downstairs but refused to talk to Sargent, on advice of her attorney. Eleonora was brought downstairs and placed in Sargent's car.

A preliminary hearing was held on the neglect petition at the Dover (New Hampshire) District Court on December 21. Elena Katz and Arnold Grodman were present and were represented by counsel. Sargent was also present. The district judge did not hear testimony, but instead relied solely on the affidavit submitted by Sargent in support of her neglect petition to find that the circumstances presented an imminent danger to Eleonora. The court issued an order finding reasonable cause to believe Eleonora was neglected and granting DCYF temporary legal custody. Although the order allowed DCYF to give physical custody of Eleonora to her father, Eleonora was placed in foster care. The order allowed liberal visitation. Following the court's preliminary findings and order, Katz returned to live with Arnold Grodman, agreed to undergo psychological evaluation, and complied

5

with other conditions required by DCYF. Eleonora was returned to live with her parents on January 6, 1992, for an extended visit, and was not again removed.

Christopher Regan represented DCYF at the adjudicatory hearing on the neglect petition held on January 10, but presented only one witness. The court suspended the proceedings, and the parties entered into a consent agreement in which the parents and DCYF agreed that the neglect proceedings would be suspended; that Eleonora was not then at risk; that DCYF would continue to monitor Eleonora's care and the parents would cooperate; that Katz would resume counselling; and that DCYF would submit a status report to the court within four months.

Katz did not agree to a subsequent offer by DCYF, conveyed on May 20, 1992, to the effect that if Katz allowed visits on DCYF's behalf and promised not to sue DCYF, then DCYF would end the neglect proceeding against her. The earlier consent decree continued in effect until July 31, 1992, when a state superior court judge stayed the consent decree and ordered Regan not to prosecute the neglect petition unless DCYF obtained more substantial proof of neglect.

6

In May 1992, Richards completed a DCYF form used for reporting child neglect to DCYF's central registry.[2] The completed form listed Katz's alleged neglect of Eleonora as "founded." On June 1, the neglect form was received and stamped at the central registry. Katz was not notified until September that DCYF had completed a founded report of neglect and filed it with the central registry. Katz administratively appealed the founded report of neglect, and a hearing was held on July 12, 1993. The administrative panel determined that as of May 26, 1992, when Richards completed and filed the founded report of neglect, probable cause did not exist to support that conclusion. Accordingly, the hearing panel reversed the DCYF "founded" determination and ordered it changed to "unfounded."

## PROCEDURAL BACKGROUND

Katz, appearing pro se and as next friend of her daughter, Eleonora, originally brought suit in Strafford County (New Hampshire) Superior Court in March of 1993. At that time, the complaint named a large group of state, institutional, municipal, and individual defendants, including the Division for Children

---

[2] The central registry is a consolidated record of all founded abuse and neglect reports made under New Hampshire's Child Protection Act.

7

and Youth Services (now "DCYF"), the Department of Health and Human Services ("HHS"), "My Friend's Place," the Dover Police Department, the individual police officers, Attorney Regan, Richards, Sargent, Rollo, and others. Katz alleged civil rights claims under 42 U.S.C.A. § 1983 as well as several state law claims. The police defendants removed the case to this court on April 20, 1993. Katz's motion to remand was opposed by defendants and was denied. Plaintiffs were represented by legal counsel from November 1993, and engaged present counsel in May 1996.

During the course of this litigation, the complaint has been amended three times and several claims and defendants have been dismissed. As the case now stands, plaintiffs are Elena Katz, Eleonora Grodman, and Arnold Grodman. The defendants named in the third amended complaint are: DCYF; HHS; DCYF employees Pamela Shaw, Gayle Richards, Mary Beth Sargent Enriquez,[3] and Robert Doty, all of whom are sued in both their official and individual capacities; and DCYF contract attorney Christopher Regan, who is also sued in both his official and individual capacity.

---

[3] Despite her change of name, Mary Beth Sargent Enriquez is referred to consistently as "Sargent" in this order.

8

Plaintiffs' civil rights claim alleges that the defendants' actions violated their Fourth Amendment rights to be free from unreasonable seizures. The plaintiffs also assert state tort claims for negligence, defamation, and intentional infliction of emotional distress. Plaintiffs seek injunctive relief as well as money damages. The parties' pending motions are addressed as follows.

## DISCUSSION

The parties have filed motions raising a number of issues related to jurisdiction and the merits of plaintiffs' claims. It is appropriate to consider the latest motion for leave to amend plaintiffs' complaint first, in order to clearly establish the parties and causes of action asserted before examining the remaining pending motions.

### A.  Leave to Amend

Plaintiffs, through counsel, move for leave to file a fourth amended complaint, to add a civil rights claim asserting that Katz's Fourteenth Amendment due process rights were violated by the placing of her name in the DCYF central registry of persons

found to be perpetrators of abuse and neglect.[4] Defendants object, arguing that plaintiffs' amendment should not be allowed because of delay, prejudice, and the futility of adding the claim.

Under Federal Rule of Civil Procedure 15(a), leave to amend "shall be freely given when justice so requires." The court may exercise its discretion to deny leave to amend only if an adequate reason such as undue delay, bad faith, dilatory motive by the moving party, or the futility of the amendment exists to justify denial. See Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995). In light of the impact of the jurisdictional question on the posture of this case, which is discussed below, the plaintiffs' amendment will neither cause undue delay nor prejudice the defendants, and, the court is aware that plaintiffs have only recently obtained the services of current legal counsel.

The defendants also argue that the amendment should be denied as futile. "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman v. Computervision Corp., 90 F.3d 617, 623

---

[4] Although the plaintiffs discuss two additional state law claims in their motion for leave to amend, those claims do not appear to be included in the proposed fourth amended complaint.

10

(1st Cir. 1996). As plaintiffs' motion to amend and defendants' motion for summary judgment were filed on the same day, and the amendment is not aimed at curing the deficiencies targeted in defendants' motion, the heightened standard applied in Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994), does not apply in this case. See Glassman, 90 F.3d at 623.

Construing it in the light most favorable to plaintiffs, plaintiffs' new claim alleges that DCYF social worker Richards filed a form showing that charges of child neglect against Katz were founded, when there was no basis for that determination. Then, DCYF employees listed Katz's name on the central registry as a perpetrator of child neglect without notifying her, and a DCYF employee falsely told her that her name was not in the registry. Without analyzing the merits of plaintiffs' Fourteenth Amendment claim in detail, nevertheless, it seems apparent that any substantive due process claim may run afoul of the requirements of Albright v. Oliver, 114 S. Ct. 807, 812 (1994), and any procedural due process claim may not state a constitutional violation given the availability of post-deprivation state remedies, see e.g., Reid v. New Hampshire, 56 F.3d 332, 341 (1st Cir. 1995). However, defendants seem to challenge only the factual bases for the added claims. They have

11

not raised the potential legal infirmities mentioned here.  Any
such deficiencies in the claims would be better evaluated in the
context of a dispositive motion allowing the parties an
opportunity to fully address those substantive issues.
Accordingly, the amendment is not strictly "futile," and, there
being no other reason to deny the proposed amendment, it is
hereby allowed.

## B.    Eleventh Amendment Immunity and Jurisdiction

Plaintiffs assert federal civil rights claims against the
individual defendants in both their official and individual
capacities, as well as various state tort claims against DCYF and
HHS, and the individual defendants.[5]  Defendants have filed a

---

[5]  Claims against individuals in their official capacities
are the same as suits against the entity on whose behalf the
individual acts as agent.  Hafer v. Melo, 502 U.S. 21, 26 (1991);
Kentucky v. Graham, 473 U.S. 159, 165 (1985).  In this case,
therefore, claims against the individuals in their official
capacities are in reality claims against either DCYF or HHS, both
of which are agencies of the state.  In Will v. Michigan Dept. of
State Police, 491 U.S. 58 (1989), the Supreme Court held that
"neither a State nor its officials acting in their official
capacities are 'persons' under § 1983" relative to claims for
money damages.  Id. at 71.  Accordingly, the § 1983 claims (for
money damages) against the defendants in their official
capacities do not state a claim under 42 U.S.C. § 1983, and are
dismissed.  The result would not be different in New Hampshire's
courts.  "A State may not, by statute or common law, create a
cause of action under § 1983 against an entity whom Congress has
not subjected to liability. . . . Since this Court has construed

12

"Motion in Limine Regarding Jurisdiction Over State Law Claims" in which they assert Eleventh Amendment immunity on behalf DCYF, HHS, and the individuals sued in their official capacities. Defendants also assert sovereign immunity on behalf of the individual defendants based on defendants' interpretation of applicable state law.  Defendants' immunity arguments raise jurisdictional issues that compel the court to remand this case to state court.

The Eleventh Amendment, as construed in <u>Hans v. Louisiana</u>, 134 U.S. 1 (1890), bars claims in federal court for money damages against the state.  See <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 66 (1989); <u>Pennhurst State School and Hosp. v. Halderman</u>, 465 U.S. 89, 99 (1984); <u>Johnson v. Rodriquez</u>, 943 F.2d 104, 108-09 (1st Cir. 1991), <u>cert. denied</u>, 502 U.S. 1063 (1992). Unlike traditional jurisdictional bars, however, Eleventh Amendment immunity may be waived if the state, acting through those authorized to do so, explicitly consents to suit in federal court.[6]  <u>Atascadero State Hospital v. Scanlon</u>, 473 U.S. 234, 238-

the word 'person' in § 1983 to exclude States, neither a federal court nor a state court may entertain a § 1983 action against such a defendant."  <u>Howlett by and through Howlett v. Rose</u>, 496 U.S. 356, 376 (1990).

[6] Before the Supreme Court clarified the means by which a state could waive Eleventh Amendment immunity, the First Circuit

41 (1985); <u>Estate of Porter by Nelson v. State of Ill.</u>, 36 F.3d 684, 690 (7th Cir. 1994). In New Hampshire, an effective waiver of Eleventh Amendment immunity can only be accomplished by legislative action. <u>John H. v. Brunelle</u>, 127 N.H. 40, 43 (1985); <u>State Employees' Ass'n of N.H. v. Belknap County</u>, 122 N.H. 614, 621 (1982). New Hampshire's consent to suit in its own courts, <u>see</u> New Hampshire Revised Statutes Annotated ("RSA") 541-B, of course, does not constitute consent to suit in federal court. <u>See</u> <u>State Employees' Ass'n of N.H., Inc. v. Lang</u>, 682 F. Supp. 660, 663 (D.N.H. 1988). Accordingly, New Hampshire has not waived its Eleventh Amendment immunity for purposes of this case, notwithstanding the Attorney General's earlier acquiescence in removal and opposition to remand.

When a suit is removed from state to federal court, as this action was, claims that implicate Eleventh Amendment immunity must be remanded to state court, not dismissed. <u>See</u> <u>Roach v. West Virginia RJA</u>, 74 F.3d 46, 49 (4th Cir. 1996) (interpreting 28 U.S.C.A. § 1447(c)). Plaintiffs' state law claims against

---

held that Eleventh Amendment immunity could be waived when state defendants remove an action to federal court, <u>see</u> <u>Newfield House v. Massachusetts Dept. of Public Welfare</u>, 651 F.2d 32, 36 n.3 (1st Cir.), <u>cert. denied</u>, 454 U.S. 1114 (1981), and that New Hampshire's implementation of district court orders showed consent to federal court jurisdiction, <u>see</u> <u>Garrity v. Sununu</u>, 752 F.2d 727, 738 (1st Cir. 1984).

14

DCYF, HHS, and various state employees in their official capacities, seek money damages against the state. Therefore, this court is without subject matter jurisdiction over those claims, given the terms of the Eleventh Amendment. Accordingly, those claims must be remanded to state court.

The circuits disagree as to whether the removal and remand statutes, 28 U.S.C.A. §§ 1441 and 1447, allow claims from a single case to be divided between state and federal court when a federal court lacks jurisdiction as to some claims. Compare Kruse v. State of Hawaii, 68 F.3d 331, 334-35 (9th Cir. 1995) (adopting Sixth Circuit rule that claims may be split, rejecting Fifth and Seventh Circuit rules to the contrary); with Francis J. v. Wright, 19 F.3d 337, 341 (7th Cir.) (federal court cannot split claims subject to Eleventh Amendment immunity from those that permit jurisdiction), cert. denied, 115 S.Ct. 204 (1994); see also Miles v. Kilgore, 928 F. Supp. 1071, 1082-84 (N.D. Ala. 1996) (discussing views of different courts); Ta v. Niemes, 927 F. Supp. 977, 980-84 (W.D. Tex. 1996) (same); Flores v. Long, 926 F. Supp. 166, 168-70 (D.N.M. 1995) (same). The First Circuit has not addressed the issue.

Several factors persuade the court that under the particular circumstances presented here it is more appropriate to remand

15

what remains of the case on the grounds that removal was improvidently granted. First, the state and federal claims arise from the same basic facts. If, for example, this court were to follow the Ninth and Sixth Circuits, remanding the state tort claims against DCYF and HHS while retaining the state tort claims against the individuals, inconsistent verdicts becomes a plausible risk. In addition, the state tort claims and the federal § 1983 claims against the individual defendants depend upon the same facts and will require the same proof. Thus, the same evidence would be necessary to pursue essentially the same litigation in both courts, amounting to a wasteful duplication of effort and a waste of limited resources. While this court can decide only some of the claims, the state court's jurisdiction extends to all of the claims.

Third, the state has raised a somewhat novel interpretation of state law to invoke sovereign immunity as to the state tort claims. Defendants assert that a recent amendment to RSA ch. 541-B, § 541-B:9-a (Supp. 1995) (eff. Jan. 1, 1995), requires that the state be substituted for the individual state employee defendants be the named defendants, relative at least to the state tort claims. Then, defendants argue, because the state has preserved its sovereign immunity (RSA § 99-D:1) except as

16

specifically waived in RSA ch. 541-B, the recovery limit set in § 541-B:14, I ($250,000 per claimant for a single incident) controls plaintiffs' recovery here. Defendants may be correct, or it may be that the Legislature intended the state to step into the shoes of the individual defendants and assume whatever liability they as individuals might have. In any event, defendants' argument would require this federal court to interpret a relatively new state statute as a matter of first impression and to determine whether the statute was intended to have, or even can have, retroactive effect in this case. That legal analysis is better undertaken in state court, where the matter can eventually be reviewed by the New Hampshire Supreme Court.

For the reasons stated, the court determines that removal of this case was improvidently granted, that this court is without jurisdiction over the money damages claims against the state agencies and DCYF employees sued in their official capacities, and, therefore orders that the case be remanded to state court. 28 U.S.C.A. § 1447(c). The parties' motions related to state tort causes of action and particular evidentiary or discovery matters are denied without prejudice to refiling same in state court. However, because the parties have raised issues pertinent

to the federal § 1983 causes of action over which the court does have jurisdiction, those motions and issues are resolved as follows.

## C. **Injunctive Relief**

In addition to money damages, plaintiffs also seek injunctive relief under § 1983 against the individual defendants in their personal and official capacities. State officials sued in their official capacities are subject to § 1983 liability for purposes of injunctive relief. Will, 491 U.S. at 71 n.10. Based on the pleadings and the record, it seems doubtful that plaintiffs will be able to meet at least one requirement for injunctive relief — showing likelihood of future injury sufficient to constitute irreparable harm. City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (plaintiff seeking injunctive relief cannot rely on past wrongs but must show "a sufficient likelihood that he will again be wronged in a similar way"). However, because the parties do not address the point in their pleadings, and may wish to present relevant evidence, plaintiffs' claim for injunctive relief is left for consideration by the state court.

18

## D. **Absolute Immunity**

Christopher Regan, who represented DCYF during the neglect proceedings against Katz, and the individual DCYF defendants' who participated in taking custody of Eleonora as well as the neglect proceeding against Katz, seek dismissal of the § 1983 claims against them on grounds that they are entitled to absolute immunity. Absolute immunity protects defendants from claims for money damages[7] based on the defendants' actions "in initiating a prosecution and in presenting the state's case." Imbler v. Pachtman, 424 U.S. 409, 431 (1976). As prosecutorial immunity is based on the quasi-judicial nature of the prosecutorial function, only those actions intimately connected with the prosecutorial function are absolutely immunized, while other actions by the same defendant that are merely investigative or administrative are not. See Buckley v. Fitzsimmons, 509 U.S. 259, 273-76 (1993); Burns v. Reed, 500 U.S. 478, 489-92 (1991); Butz v. Economou, 438 U.S. 478, 515 (1978). Therefore, it is necessary

---

[7] Absolute immunity does not protect defendants from claims for prospective injunctive relief in § 1983 actions. Pulliam v. Allen, 466 U.S. 522, 541-42 (1984). Accordingly, as long as plaintiffs' claims for injunctive relief survive, claims based on the actions of defendants otherwise protected by absolute immunity also survive.

to consider the pertinent function of each defendant asserting absolute immunity.

### 1. Christopher Regan

In an order dated March 31, 1994, this court determined that Christopher Regan was entitled to absolute immunity against plaintiffs' claims that were based on his prosecution of the neglect petition against Katz, and those claims were dismissed. The order specifically left undecided whether plaintiffs also alleged claims against Regan based on functions outside of his role as prosecutor that would not be protected by absolute immunity. Defendant Regan now moves to dismiss all claims against him, and plaintiffs move for reconsideration of the prior order dismissing claims.[8]

Plaintiffs allege that Regan attended the adjudicatory hearing on January 10, 1992, on behalf of DCYF, and that his only witness was an individual from "My Friend's Place" who could not testify that he had observed any abuse or neglect of Eleonora by

_____

[8] In support of the motion for reconsideration, plaintiffs argue that Regan should be held liable for his activities in giving legal advice to DCYF staff. Plaintiffs' complaint, however, does not include allegations that Regan gave legal advice to DCYF staff which lead to violations of the plaintiffs' Constitutional rights.

Katz. Plaintiffs also allege that Regan was aware of favorable evaluations of Katz but refused to offer them at the hearing. Plaintiffs further allege that Regan deliberately thwarted their attempts to have a fair hearing and made repeated attempts to seal the file of the case without justification. Plaintiffs also allege that Regan attempted to force Katz and Grodman to sign a consent agreement admitting neglect in order to regain custody of their child.

All of Regan's actions, as alleged by plaintiffs in the fourth amended complaint, are protected by absolute immunity. In representing DCYF at the hearing and in subsequent proceedings, Regan was acting as an advocate for the state. See Malachowski v. City of Keene, 787 F.2d 704, 712 (1st Cir. 1986); see also Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995). In addition, Regan cannot be held liable for withholding exculpatory information. Reid v. New Hampshire, 56 F.3d 332, 337 (1st Cir. 1995). Settlement negotiations, like plea bargains, are part of the prosecutorial function, and a defendant is protected from liability for those actions. See Mendenhall v. Goldsmith, 59 F.3d 685, 691 (7th Cir.), cert. denied, 116 S.Ct. 568 (1995). Accordingly, all § 1983 claims for money damages against Regan are dismissed.

21

## 2. Other defendants

Defendants invoke absolute immunity from plaintiffs' claims that are based on the initiation and prosecution of neglect proceedings against Katz. It is well established that actions by social workers initiating and prosecuting child neglect proceedings are protected by absolute immunity. See Malachowski, 787 F.2d at 712; see also Frazier v. Bailey, 957 F.2d 920, 931 n.12 (1st Cir. 1992); Salyer v. Patrick, 874 F.2d 374 (6th Cir. 1989). Participation in a proceeding for temporary custody is also protected by absolute immunity, so that to the extent plaintiffs assert constitutional claims based on Sargent's affidavit, she is not liable. See Thomason v. SCAN Volunteer Servs., Inc., 85 F.3d 1365, 1373 (8th Cir. 1996). However, defendants generally are not protected by absolute immunity for actions taken prior to or outside of the judicial process, such as their investigation of neglect, their decision to remove children from their home without a court order, or placement of a parent's name in a central registry of founded abusers. See, e.g., Snell v. Tunnell, 920 F.2d 673, 687-90 (10th Cir. 1990); Achterhof v. Selvaggio, 886 F.2d 826, 829-31 (6th Cir. 1989); Vosburg v. Department of Social Servs., 884 F.2d 133, 138 (4th

22

Cir. 1989); Hodorowski v. Ray, 844 F.2d 1210, 1214 (5th Cir. 1988).

Accordingly, defendant Sargent is entitled to absolute immunity from liability as to any § 1983 claims that are based upon her participation in the probable cause hearing on December 21, 1991, but not as to claims based upon her investigation of the report of neglect, or her decision to remove Eleonora prior to obtaining a court order.  Similarly, other DCYF employees (Shaw, Richards, and Doty) are entitled to absolute immunity as to all claims based on their participation in neglect proceedings, but not for claims based on their investigation of possible neglect by Katz, or on performance of administrative duties at DCYF.

## E.  The Fourth Amendment Claim

Defendants move for summary judgment in their favor on plaintiffs' Fourth Amendment claim asserting both that plaintiffs cannot properly support their claim and that defendants are entitled to qualified immunity.  Before addressing the merits of defendants' motion, it is necessary first to clarify the Fourth Amendment claim as it presently stands.

23

Plaintiffs' Fourth Amendment claim is confused, to some extent, with their previously dismissed claim asserting a violation of their rights to family integrity under the Fourteenth Amendment. All individual defendants were held to be entitled to qualified immunity as to the family integrity claims on grounds that the constitutional right was not clearly established in 1991, see Frazier, 957 F.2d at 931. Those Fourteenth Amendment claims were dismissed in the court's Order in this case dated March 31, 1994. Plaintiffs' Fourth Amendment claim was not dismissed at that time because the complaint asserted that defendants knew they did not have probable cause to support their actions.[9]

Currently, plaintiffs seem to assert two Fourth Amendment claims: (1) that defendants subjected Eleonora to an unreasonable seizure when they took her from her mother; and (2) that defendants pressed child neglect charges against Katz without probable cause. The claim that charges were pressed against Katz does not implicate her Fourth Amendment right to be free of

---

[9] Although defendants use language pertaining to a motion to dismiss in addressing the Fourth Amendment claims, prompting plaintiffs to argue that the court previously denied the motion to dismiss, their motion is in fact one for summary judgment as they rely on record evidence outside of the pleadings.

unreasonable searches and seizures.[10]  Also, as all defendants are entitled to absolute immunity for initiating and pursuing child neglect charges, to the extent the Fourth Amendment claim is based on pressing neglect charges, it is dismissed.

Furthermore, because only Eleonora was "seized," not her parents, only she has a Fourth Amendment claim.  Fourth Amendment claims by Katz and Grodman based on the removal of Eleonora from her mother's custody are dismissed.  Finally, based on the allegations in the complaint, DCYF social worker Sargent is the only remaining defendant implicated in "seizing" Eleonora.[11]

Eleonora's Fourth Amendment claim appears to be that Sargent took her from her mother and placed her in protective custody without probable cause to believe that she was in imminent danger of harm, and kept her in foster care rather than placing her with her father, without probable cause to believe that she was neglected.  A claim based on loss of liberty, or seizure, arising

_____

[10]  Although Katz might also argue that she was "seized" in that she suffered negative effects relative to having her name listed in the central registry, to the extent she makes that claim she must decide whether it is properly a Fourth Amendment claim or a Fourteenth Amendment claim as it is now cast.

[11]  Although plaintiffs allege that Richards and Shaw were involved in investigating the reports of neglect by Katz, plaintiffs do not allege that either participated in the decision to place Eleonora in protective custody or that Shaw's supervision of Sargent was constitutionally deficient.

out of child abuse and neglect proceedings may raise issues that are qualitatively different from those presented in typical seizure cases.  See, e.g., Snell v. Tunnell, 920 F.2d 673, 697 (10th Cir. 1990); Baker v. Racansky, 887 F.2d 183, 187-89 (9th Cir. 1989); Dietz v. Damas, 932 F. Supp. 431, 444-48 (E.D.N.Y. 1996); Tenenbaum v. Williams, 862 F. Supp. 962, 973-76 (E.D.N.Y. 1994), reconsideration denied, 907 F.Supp. 606 (1995); see also Jordan by Jordan v. Jackson, 15 F.3d 333, 349-351 (4th Cir. 1994) (examining nature of protective custody in comparison to arrest in context of Fourteenth Amendment requirements); Lossman v. Pekarske, 707 F.2d 288, 290 (7th Cir. 1983) (same).  Because the parties have not briefed these issues in context, however, assessing the viability of Eleonora's Fourth Amendment claim would be premature at this juncture.

Alternatively, even if Eleonora's Fourth Amendment claim is viable, Sargent claims qualified immunity from liability.  In contrast to the fogginess of Fourth Amendment requirements in this area, state law establishes a clear standard for removing a child into protective custody:

> A police or juvenile services officer may take a child into protective custody without the consent of the parents or the person legally responsible for the child's care if the child is in such circumstances or surroundings as would present an imminent danger to the child's health or life unless immediate action is taken

26

and there is not enough time to petition for a court order.

RSA 169-C:6, I. <u>See also</u>, <u>Malachowski</u>, 787 F.2d at 713-14 (compliance with state statute may provide qualified immunity). Although the state district court found there was "reasonable cause"[12] to believe that Eleonora was neglected when it temporarily resolved DCYF's petition to keep Eleonora in state custody, Sargent can rely on that finding only if she did not deliberately manufacture probable cause by knowingly providing false facts in her affidavit which the court relied on for its finding, and if the court's probable cause determination was not deficient on its face. <u>See</u> <u>Snell</u>, 920 F.2d at 698 (citing <u>Franks v. Delaware</u>, 438 U.S. 154 (1978)); <u>see also</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 345 (1986). Also, there is some question whether Sargent complied with the court order by keeping Eleonora in foster care when the order allowed placement with her father.

Whether Sargent is entitled to qualified immunity, and she may well be, cannot be resolved in Sargent's favor on the record presented here for summary judgment, because her entitlement may be fact-driven, and the record is hardly clear as to whether

---

[12] The court does not address the significance, if any, of the district court's determination of "reasonable cause," rather than "probable cause" that Eleonora was neglected.

material facts related to qualified immunity are or are not genuinely disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986) (evidence must be so one-sided that a reasonable jury could only find one way).  In addition, because the same factual issues will be examined in the context of the state tort claims upon remand, it is preferable to cede to the state court resolution all claims based on the same findings of fact.  Accordingly, the motion for summary judgment is denied without prejudice to refiling a well-supported motion in state court.

## F.    Summary

Plaintiffs' motion to amend is granted, and the action, as pled in the fourth amended complaint, and as modified by this Order, is remanded to Strafford County (New Hampshire) Superior Court.  Plaintiffs' current § 1983 claims are:  (1) a Fourth Amendment unreasonable seizure claim by Eleonora against Sargent in her individual capacity; (2) Fourteenth Amendment due process claims by Katz against named DCYF employees in their individual capacities; and (3) a claim by Katz for injunctive relief to prevent DCYF from acting in a similar manner in the future. Plaintiffs' state law claims against DCYF, HHS, and the individual defendants are: (1) negligence; (2) defamation; and

28

(3) intentional infliction of emotional distress. Plaintiffs also seek an enhanced compensatory damages remedy under applicable state law.

## CONCLUSION

Plaintiffs' motion for leave to amend (document no. 211) is granted. Defendants' motion to dismiss state tort claims for lack of jurisdiction (document no. 195) is denied as described in this order. Defendants' motions in limine (documents nos. 188, 189, 190, 191, 214, 221, 222, 223) are denied without prejudice to refiling same in state court. Plaintiffs' motions in limine (documents nos. 179, 193, 194, 225) are denied without prejudice to refiling in state court. Plaintiffs' motion to reconsider (document no. 185) and motion to compel discovery (document no. 184) are denied. Plaintiffs' motion for leave to file response (document no. 229) is denied as moot. Defendants' motions to dismiss and for summary judgment (documents nos. 160, 192, 209) are granted as to absolute immunity for defendant Regan and other named defendants for initiating neglect proceedings and are otherwise denied without prejudice.

This case is, or ought to be, ready for trial on the merits, discovery having been completed.

29

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

**November 20, 1996**

cc:  Suzan M. Lehmann, Esq.
     Charles G. Douglas, III, Esq.