USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 97-2011 FREDERICK C. MELTZER, Plaintiff, Appellee, v. COMERICA, INC. and MUNDER CAPITAL MANAGEMENT, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy J. Gertner, U.S. District Judge] ____________________ Before Boudin, Circuit Judge, Aldrich, Senior Circuit Judge, and Lynch, Circuit Judge. ____________________ Gary D. Friedman with whom Kenneth M. Bello, Joseph P. Curtinand Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. were onbrief for appellants. Frank J. Teague with whom Edward T. Patten and Mills, Teague& Patten were on brief for appellee.   April 3, 1998    BOUDIN, Circuit Judge. Frederick Meltzer brought suit instate court, claiming that he had been discharged without cause andwithout the compensation specified in his employment contract. The case was removed to federal court based on diversity ofcitizenship. Following a trial, the jury found in favor of Meltzerand awarded him almost $400,000 in damages. This appeal by the district-court defendants followed. The main issue on appeal is whether the defendants wereentitled to judgment notwithstanding the verdict. In substance, defendants claim the jury was obliged to find that Meltzer hadengaged in "an act of serious misconduct" which under his contractwould have justified dismissal without further compensation. Weset forth the facts in the light most favorable to the verdict. Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997). In 1993, Comerica, Incorporated, formed a wholly ownedsubsidiary, World Asset Management. The following year the new subsidiary hired Meltzer as the managing director of its fixed income bond department. To lure him away from his job with anestablished Boston firm, World Asset Management gave him a three-year contract at a high salary with a guaranteed minimum bonus. The contract provided that if terminated without cause, Meltzerwould receive the balance of compensation specified for the entire contract. "Cause" was further defined as including "an act of serious misconduct." During 1994, World Asset Management had under lease aportable computer terminal from Bloomberg LP, a device known in thetrade simply as a "Bloomberg," providing access to real-time stockand bond market quotes and other information. Meltzer's companyalso leased software, used in risk management for bond portfolios,from Capital Management Sciences, a competitor of Bloomberg LP.  World Asset Management secretly lent the Bloomberg computer toCapital Management Sciences in exchange for a discount on the cost of the risk-management software. The persons primarily responsible for the decision toloan the Bloomberg were Meltzer's superior, Charles Kelso (CEO ofWorld Asset Management) and Meltzer's subordinate, Jonathan Jensen. Meltzer was present at the meeting in which Jensen proposed the loan and Kelso approved it. According to Meltzer, he made nocomment on the proposal, nor did he attempt to raise the matter with higher level officials at Comerica. The meeting was inSeptember 1994, and the Bloomberg was actually loaned to Capital Management Sciences in December 1994. In the meantime, Comerica affiliated itself with another company, Munder Capital Management, and the two companiesreorganized World Asset Management as a partnership between them. Kelso was replaced as head of World Asset Management by StephenAlbrecht. Meltzer said at trial that he told Albrecht about theloan of the Bloomberg during December 1994, and Albrecht approvedthe plan. In any event, Albrecht made further inquiries of Meltzer in February 1995 and ultimately told Meltzer to retrieve the Bloomberg, which Meltzer did. In February 1995, Albrecht discharged Meltzer,purportedly on the ground that his involvement in the loan of the Bloomberg constituted "serious misconduct." Meltzer in turnbrought the present action against Comerica and the Munder firm. The defendants accept responsibility for carrying out World AssetManagement's employment contract with Meltzer but insist that hewas fired for cause. In returning a verdict in Meltzer's favor,the jury found by special verdict that Meltzer had not engaged in "an act of serious misconduct." The parties agree that Meltzer's employment contract mustbe construed in accordance with Michigan law. The defendants pointus to case law in Michigan holding that an employer can establishits own standards for job performance and can dismiss for cause anyemployee who fails to adhere to those standards, even if the judge or the jury might think that the standards were unreasonablydemanding. See Toussaint v. Blue Cross & Blue Shield of Michigan,292 N.W.2d 880, 897 (Mich. 1980). The gist of defendants' argumenton appeal is that the loan of the Bloomberg was manifestly improperand that Meltzer's "participation" or "involvement" necessarily constituted "serious misconduct" providing cause for his termination. Defendants argue at length that the loan violated the terms of the Bloomberg contract, the general provisions of the Comerica's code of ethics requiring employees to safeguard confidential information, and other civil and criminalrestrictions. It is sufficient for us that the extent of Meltzer'sinvolvement or participation in the loan was disputed and that on one reading of the evidence he was no more than minimallyconnected. The jury was thus free to conclude that even if theloan were serious misconduct, Meltzer's connection to it was not "serious misconduct" on his part. Defendants next assert that they were entitled to aninstruction that, although Meltzer asserted that Kelso had approved the loan, "[i]t is not a defense that a supervisor authorizedunlawful, unethical or unreasonable acts to be performed." Thedefendants' proposed instruction contained other language that thedistrict court did adopt, including the tamer statement that "[a]nemployer [sic] only has a duty to follow a supervisor's orders ifthose orders are lawful," and "[a]n employee cannot be discharged for refusing to perform an unlawful act." But obviously theadditional language requested by the defendants would have been even more helpful to them. The difficulty is that the key sentence that the districtjudge refused to charge seems to us to be misleading in the context of these facts. While there is certainly some behavior that asupervisor cannot "authorize," in the present case Kelso's alleged approval had at least some bearing on the question whetherMeltzer's failure to report or interfere with the transaction was"serious misconduct." Being unbalanced, the instruction as framed by the defendants did not have to be given. See Harrington v. United States, 504 F.2d 1306, 1317 (1st Cir. 1974). The defendants further object that Meltzer's post- termination earnings should have been offset against hiscompensation due under the contract. Well before the scheduledtrial, defendants stipulated that if Meltzer was not discharged for serious misconduct, then his damages were the specific amountcalculated under his contract for the remainder of the three-year term, specifically, $398,773.97. Ten days prior to trial thedefendants moved to set aside that stipulation, and, several dayslater, they moved to amend their answer to assert an affirmative defense of actual mitigation. We see no error in the district court's decision thatdefendants' last-minute attempted change of position should not beallowed because of the extreme delay and the prejudice to Meltzer. See Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1995) (denialof leave to amend reviewed for abuse of discretion). This makes itunnecessary to consider the district court's alternative rulingthat, under the language of the contract, Meltzer was entitled (ifdischarged for cause) to the balance of the prescribed compensation with no reduction on account of post-termination earnings elsewhere. Finally, defendants' brief challenges several rulings bythe district judge on the admissibility of evidence during trial. We have examined her rulings and concluded that they are eithercorrect or, if not, that they did not constitute prejudicial error. Without going into detail, it is plain that the result of the case would have been no different if each of the three challenged rulings had been resolved by the trial judge in favor of the defendants. Affirmed.