### CTC COMMUNICATIONS CORP., Plaintiff,

v.

### BELL ATLANTIC CORPORATION, Defendant.

### No. Civ. 97–395–P–C.

United States District Court, D. Maine.

Jan. 12, 1999.

Joseph H. Groff, III, Michael A. Nelson, Jensen, Baird, Gardner & Henry, Portland, Maine, Roger D. Young, Anthony P. Cho, Steven Susser, Young & Associates, Southfield, MI, for plaintiff.

Richard H. Dolan, Katherine M. Oberlies, Jeffrey Morton Eilender, Schlam, Stone & Dolan, New York City, Jotham D. Pierce Jr., Jeffrey M. White, Debra L. Brown, Pierce Atwood, Portland, Maine, Robert M. Hayes, Eric Uhl, Melinda J. Caterine, Jonathan E. Kapp, Moon, Moss, McGill & Bachelder, P.A., Portland, Maine, Micki M. Chen, Jack H. White, Robert J. Zastrow, John Thorne, Bell Atlantic Network Services Inc., Arlington, VA, Richard H. Dolan, Schlam, Stone & Dolan, New York City, Dan K. Webb, Robert W. Tarun, Jennifer J. Demmon, Winston & Strawn, Chicago, IL, for defendant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge having filed with the Court on November 19, 1998, with copies to counsel, his Recommended Decision on Defendant's Motion for Summary Judgment (Docket No. 118); and Plaintiff having filed its objection thereto on December 7, 1998 (Docket No. 119), to which objection Defendant filed its response on December 24, 1998 (Docket No. 129); and Defendant having filed its objection to the Recommended Decision on December 7, 1998 (Docket No. 120), to which objection Plaintiff filed its response on December 23, 1998 (Docket No. 127); and this Court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; and this Court having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision, and concurring with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and having determined that no further proceeding is necessary; it is **ORDERED** as follows:

(1) Plaintiff's objection is hereby **DENIED**;

(2) Defendant's objection is hereby **DENIED**;

(3) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**;

(4) Defendant's Motion for Summary Judgment is hereby **GRANTED** as to any claims in Count I arising out of the provision in the Agency Agreement for a separation payment in the event of elimination of the Defendant's third-party marketing channel, as set forth in paragraph 51 of the First Amended Complaint, and as to any antitrust claims arising out of paragraphs 41(c) and 56(e) in the First Amend-

ed Complaint, and is otherwise **DE-NIED**.

(5) Plaintiff's implied motion to dismiss claims raised in paragraphs 41(i), 56(m), and 86(j) of the First Amended Complaint is hereby **GRANTED**.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DAVID M. COHEN, United States Magistrate Judge.

The defendant, Bell Atlantic Corporation ("Bell"), has moved for summary judgment on all remaining counts[1] in the First Amended Complaint except Count V–2, which alleges breach of certain resale agreements. The counts at issue allege breach of an agency agreement, violations of the applicable provisions of antitrust law, and violations of the Telecommunications Act of 1996.[2] I recommend that the court grant the motion in part and deny it in part.

### I. Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party....' " *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, "the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); Fed. R.Civ.P. 56(e). "This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof." *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996) (citations omitted).

1. Count III of the First Amended Complaint has been dismissed, as well as any claims asserted in Count II arising out of Paragraph 56(a), any antitrust claims arising out of Paragraph 56(b), and any claims in Count V[–1] arising out of an alleged refusal to sell voice mail services. Order Affirming the Recommended Decision of the Magistrate Judge ("Affirming Order") (Docket No. 111) at 2. The First Amended Complaint includes two counts identified as Count V; the first will be referred to herein as Count V–1 and the second as Count V–2.

2. The plaintiff, CTC Communications Corp. ("CTC"), "voluntarily dismiss[es]" claims based on Paragraphs 41(i), 56(m) and 86(j) in its First Amended Complaint. CTC Communications' Memorandum of Law in Opposition to Bell Atlantic's Motion for Summary Judgment ("CTC's Opposition") (Docket No. 101) at 4 n. 1. CTC also contends that Bell has not challenged Paragraphs 50(b), 51(a), 56(h), and 56(k) of the First Amended Complaint in its motion for summary judgment. *Id.* Bell specifically disputes this characterization of its motion as to Paragraphs 56(h) and 56(k) in its reply. Bell Atlantic's Reply Memorandum in Support of its Motion for Summary Judgment ("Bell's Reply") (Docket No. 108) at 1–2 & n. 2. There is no Paragraph 51(a) in the First Amended Complaint. CTC's characterization of Bell's argument as to its claim for breach of contract based on Paragraph 50(b) in Count I is correct.

## II. Factual Background

The following undisputed material facts are appropriately supported in the summary judgment record.[3] CTC is in the business of selling telecommunications services to customers in New York and New England. Affidavit of Robert Fabbricatore ("Fabbricatore Aff."), Exh. B to CTC's Opposition, ¶¶ 5–6. Bell is a telecommunications carrier that sells telecommunication services in the mid-Atlantic states, New York and New England. Declaration of David Mahan ("Mahan Dec."), Exh. A to CTC's Opposition, ¶ 4; SEC Filing, Bell Atlantic Corp., December 31, 1996, Exh. J to CTC's Opposition, at 1. Bell is the corporate successor to NYNEX. E-mail dated April 24, 1997, Exh. L to CTC's Opposition. Bell provides local exchange telephone service within a specified geographic area. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 139, 186 (D.D.C.1982). The Telecommunications Act of 1996, codified in part at 47 U.S.C. § 251, imposes certain obligations on local exchange carriers to foster the growth of competition for telecommunications services involving calls that originate and terminate within a local access and transport area ("LATA"). Such services are known as "intraLATA services."

Beginning in 1984, CTC sold intraLATA services pursuant to a series of agency agreements with NYNEX; NYNEX also sold these services directly. Fabbricatore Aff. ¶ 6; Mahan Dec. ¶ 4. The most recent agency agreement between CTC and NYNEX is dated February 1, 1996 ("the Agency Agreement"). Fabbricatore Aff. ¶ 6. The Telecommunications Act of 1996 (sometimes "the Act") took effect on February 8, 1996. Act of February 8, 1996, Pub.L. No. 104–104, 1996 U.S.C.C.A.N. (110 Stat.) 56, 161. After the Act took effect, CTC decided to become a reseller of Bell intraLATA services in competition with Bell. Fabbricatore Aff. ¶¶ 9–12. CTC has entered into written Resale Service Agreements with Bell for the resale of Bell's intraLATA telecommunications services ("the Resale Agreements"). *Id.* ¶ 15. In February 1997 NYNEX cut its commission payments to its agents by 15%. Mahan Dec. ¶ 8.

The Telecommunications Act of 1996 requires, *inter alia*, that regional Bell operating companies ("RBOCs") and "incumbent local exchange carriers" ("ILECs") sell at wholesale any telecommunications service that they sell at retail, 47 U.S.C. § 251(c)(4)(A); that ILECs offer elements of their networks for use by their competitors on an "unbundled" basis, 47 U.S.C. § 251(c)(3); and that ILECs allow competitors to interconnect with their networks, 47 U.S.C. § 251(c)(2). Bell Atlantic is both an RBOC and an ILEC. Bell makes as great a profit on the local telephone services it sells at wholesale as it does when it sells the same services at retail. Memorandum of Decision and Order ("Decision on Motion to Dissolve TRO, etc.") (Docket No. 92) at 16; Mahan Dec. ¶ 11.

---

3. CTC has moved to strike Bell Atlantic Corporation's Local Rule 56 Statement of Undisputed Material Facts ("Bell's SMF") (Docket No. 100), submitted in support of its motion for summary judgment as required by this court's Local Rule 56, on the ground that it fails to comply with the local rule in that it is composed of "sweeping assertions liberally sprinkled with legal opinions, legal conclusions, and legal argument, all of which are absolutely unsupported by any admissible evidence." CTC's Motion to Strike Bell Atlantic's Statement of Undisputed Material Facts (Docket No. 103) at 1. While there are many instances in which particular sentences or paragraphs among the unnumbered paragraphs in Bell's 19–page SMF do not meet the requirements of the local rule, striking the entire document is not the appropriate sanction. Where necessary, I will identify those portions of Bell's SMF upon which the court will not rely due to failure to meet the requirements of the local rule. I note that the court's task is made more difficult by the fact that CTC does not respond directly to any of the factual assertions in Bell's SMF, making it necessary for the court to compare every entry in CTC's 25–page Statement of Disputed Material Facts (Docket No. 102) with every acceptable entry in Bell's SMF, a very time-consuming exercise in a case of the magnitude and complexity of this action.

In August 1997 Bell eliminated its Account Management Program ("AMP"), in which CTC participated as an agent, for customers spending less than $40,000 annually for local telephone services. Mahan Dec. ¶ 12. Bell assumed direct account management for these customers. *Id.* As an AMP agent, CTC sold Bell products to end-users and was paid a commission on each such sale. Decision on Motion to Dissolve TRO, etc. at 4. Bell also paid fees to CTC to manage the relationship between Bell and its customers by providing information and service to the customer at no additional charge. *Id.*

The Agency Agreement, which was drafted exclusively by NYNEX, *id.* at 7, includes a covenant not to compete which provides that

> for a period of twelve (12) months after the expiration or termination of this Agreement Representative may not sell, represent, or promote any non-NYNEX IntraLATA services to any NYNEX Business Customer for whom Representative was responsible under the AMP Program, or to whom Representative sold any NYNEX Service, within 12 months prior to such expiration or termination.

Agreement for Sale of Services & Account Management ("Agency Agreement"), Exh. J to Bell's SMF, at § D.1.s., p. 8. The Agency Agreement also provides that the agent shall

> [r]etain [accurate and complete books of account, documents and records] for a period of three (3) years from the date of final payment by NYNEX for services rendered under this Agreement. NYNEX and its authorized agents and representatives shall have access to such records for purposes of audit during normal business hours during the term of this Agreement and for three (3) years from the date of final payment. NYNEX shall notify Representative in writing at least seven (7) days before NYNEX intends to conduct such an audit.

*Id.,* § D.1.p., p. 8. NYNEX's responsibilities under the Agency Agreement include payment of commissions "not later than thirty (30) days following the end of the month during which a fully negotiated and accurate order is issued by NYNEX" or "not later than thirty (30) days following the end of the month during which the installation of a Service sold by Representative is verified by NYNEX." *Id.* § F.1.d., at 12. In addition, NYNEX had the right under the Agency Agreement to "set off against any payment due by it hereunder any amounts owed to it by Representative under this Agreement or any other agreement between the parties." *Id.* § F.4., at 16. Finally, the Agency Agreement provides that

> [i]n the event the NYNEX determines to eliminate its third party marketing sales channel, NYNEX, at its option, agrees to:
>
> a. either terminate this Agreement only upon twelve (12) months prior written notice, except that, in the event of Representative's substantial lack of performance hereunder ..., NYNEX may terminate this Agreement by providing Representative with notice pursuant to Section C. of this Agreement,
>
> or
>
> b. pay to Representative a separation payment based on 50% of the Representative's earned compensation during the twelve (12) months preceding termination.

*Id.* § F.5., at 16–17. The term "third party marketing sales channel" is not defined in the Agency Agreement.

Since March 1997 the parties have disputed the amounts due to CTC under the Agency Agreement; CTC asserts that Bell owes it over $12 million. Declaration of John D. Pittenger, Exh. R to CTC's Opposition, ¶ 2 & Schedule A. In a letter dated December 30, 1997 Bell notified CTC that "the sales agency agreement is terminated immediately due to CTC's material breach thereof." Letter from Jack H. White, Jr.

to Robert Fabbricatore, Exh. AA to CTC's Opposition, at 1.

In October 1997 Bell informed CTC that it would not make voice mail services available to customers who purchased local telephone lines from resellers, except in the state of New York. Mahan Dec. ¶ 19. In January 1998 Bell implemented a new policy pursuant to which it would charge customers who had signed multi-year contracts for particular local telecommunications products a fee if they chose to switch from Bell to a reseller as the provider of that same product. *Id.* ¶ 23. This fee equals the present value of the remaining charges under the contract. *Id.* In February 1998 Bell notified CTC that it would no longer allow direct contact between CTC and Bell's technical and engineering personnel involved in the design and implementation of CTC's resale orders. *Id.* ¶ 26. This results in delay in CTC's provision of services to its customers. *Id.* In March 1998 Bell implemented another new policy concerning its Business Link service, which provides deferred discounts called "Bonus Credits." *Id.* ¶ 27; Declaration of Charlotte TerKeurst in Opposition to Bell Atlantic's Motion for Summary Judgment ("TerKeurst Dec."), Exh. F to CTC's Opposition, ¶ 41. The new policy provides that the credits will be terminated when a customer chooses to change from buying Business Link service directly from Bell to buying it from a reseller. Mahan Dec. ¶ 27.

CTC has initiated proceedings concerning Bell's termination fees before the public utility regulatory agencies in Maine, New Hampshire, Vermont, Massachusetts, New York and Rhode Island. Declaration of Kenneth Gordon in Support of Bell Atlantic's Motion for Summary Judgment ("Gordon Dec.") (Docket No. 99), ¶ 20. Bell's Business Link program and termination charges are subject to tariffs, which are detailed listings of rates and other terms and conditions for services that must be filed with public utility regulatory agencies in the states in which Bell does business. *Id.* ¶¶ 10, 21. Bell "carrier access services" are subject to regulation by the Federal Communications Commission ("FCC"), which approves tariffs for those services. *Id.* ¶¶ 22–23; Plaintiff's Response to Defendant's Second Interrogatories to Plaintiff CTC Communications Corp., Exh. B to Bell's SMF, Answer 8, at 14.

### III. Discussion

#### A. Count I (Breach of Contract)

Count I of the First Amended Complaint alleges that Bell breached the Agency Agreement by failing to pay CTC over $12 million in commissions, failing to act "equitably" and "in good faith" "in light of the changes to the market engendered by the Telecommunications Act of 1996," eliminating commissions owed CTC for AMP customers, and "actually and/or constructively eliminat[ing] CTC Communications as its 'third party marketing sales channel' " but failing to pay the separation payment provided by the Agency Agreement. First Amended Complaint ¶¶ 50–51. Bell argues that CTC's claim for unpaid commissions is barred by its refusal to permit Bell to perform an audit, so that the claim is both premature and blocked by CTC's own breach, and that Bell has not eliminated its "third party marketing sales channel," so CTC is not entitled to a separation payment under the terms of the Agency Agreement. Motion for Summary Judgment and Memorandum of Bell Atlantic in Support of Motion for Summary Judgment ("Motion for Summary Judgment") (Docket No. 97) at 37–39. Bell does not address the amended complaint's claim concerning an alleged duty to act equitably and in good faith, and accordingly that claim will remain for trial in any event.

CTC responds that an audit is not a precondition for payment of commissions under the Agency Agreement and contends that it never denied Bell's demand for an audit and has supplied Bell with all available information concerning its claim

for commissions. CTC's Opposition at 37. CTC also contends that the Agency Agreement can only be interpreted so that the "third party marketing sales channel" is CTC, and that it has been effectively eliminated by Bell's decision to serve customers incurring annual charges less than $40,000 directly rather than through CTC. *Id.* at 38.

The parties agree that New York law applies to this claim.

 With respect to the claim for commissions, CTC is correct. The Agency Agreement does not require an audit before commissions are payable. To the contrary, the agreement contemplates payment within thirty days after the end of the month in which an order for the purchased service is issued by NYNEX or purchase of the service is verified. In fact, the audit provision only requires that NYNEX (and hence Bell) have access "for purposes of audit" *after* "the date of final payment." Agency Agreement, § D.1.p., at 8. If payments are due and unpaid, final payment by definition has not been made.[4] If that is the case, CTC cannot be in breach of the agreement for failing to allow an audit, a material factual allegation that in any event is hotly disputed. None of the New York case law cited by Bell supports a different interpretation of the contract language nor requires a different outcome here. Bell is not entitled to summary judgment on the claim for payment of commissions.

 The outcome is different for the claim to a separation payment under the Agency Agreement. In order to prevail on its claim, CTC would have to prove that it was the only agent for Bell that participated in the AMP program and that all of the AMP customers served by CTC incurred annual charges less than $40,000. CTC has provided no evidence in the summary judgment record to support either conclusion. Even in the unlikely event that CTC's argument that the use of the singular form of the word "channel" in the agreement means that the single agent that is the party to the agreement is that channel were adopted by the court, CTC would still have to show that it was "eliminated" by Bell's action. Without evidence in the summary judgment record that CTC served no AMP customers with annual charges in excess of $40,000, CTC has failed to contradict Bell's showing that no genuine issue of material facts exists. *Winship Green,* 103 F.3d at 200. Bell is entitled to summary judgment on the claim raised in Paragraph 51 of the First Amended Complaint.

## B. Antitrust Claims (Counts II and IV)

Bell contends that it is entitled to summary judgment on all of CTC's remaining antitrust claims[5] on a variety of grounds, some of which it invokes only with respect to certain specific paragraphs in the amended complaint: the *Noerr–Pennington* doctrine, the state action doctrine, the filed rate doctrine, the doctrine of primary jurisdiction, lack of evidence of monopolization or attempted monopolization, absence of anticompetitive effect, lack of evidence of antitrust injury, and absence of a

---

4. The offset provision of the agreement does not change this result. It does not create a condition precedent to payment of commissions; it simply gives Bell the right to set off amounts owed to it by CTC at the time Bell's payment is due to CTC. If Bell has not yet determined whether CTC owes it money from some previous transaction at the time a payment to CTC comes due under the agreement, it must wait to make a set-off at a later time when a payment to CTC is due and Bell has made the necessary determination concerning past overpayments, or that CTC owes it mon-ey for whatever other reason. The provision most certainly does not give Bell the right to delay paying commissions due to CTC indefinitely until Bell determines that CTC does or does not owe Bell money.

5. The antitrust law upon which CTC's claims in Counts II and IV of its First Amended Complaint are based is found at 15 U.S.C. § 1 *et seq.* and will often be referred to in this recommended decision as the Sherman Act.

duty to deal under the circumstances set forth in the amended complaint.

### 1. The Noerr–Pennington Doctrine.

Bell argues that this doctrine bars the claims raised in Paragraphs 41(i), 56(b), 56(f) and 56(m) of the First Amended Complaint. *Motion for Summary Judgment* at 3. This court has already dismissed any antitrust claims arising from Paragraph 56(b). *Affirming Order* at 2. CTC has indicated its willingness to dismiss any claims based on Paragraphs 41(i) and 56(m).[6] CTC's Opposition at 4 n. 1. The only paragraph remaining for discussion under the Noerr–Pennington doctrine therefore is Paragraph 56(f), which alleges that Bell has "willfully maintained" monopoly power "in the relevant market or markets of IntraLATA telecommunication services for business customers in New England and New York," First Amended Complaint ¶ 54, by

> [r]efusing to sell IntraLATA telecommunications services at wholesale prices to Resellers, including CTC Communications, who seek to sell to customers with contracts with Bell Atlantic for the provision of these services, unless the customer agrees to pay unreasonable termination fees.

*Id.* ¶ 56(f).

■ The *Noerr–Pennington* doctrine, named for two Supreme Court cases, provides that "[t]hose who petition government for redress are generally immune from antitrust liability." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Only sham recourse to governmental agencies and the courts is not immune. *Id.* at 58,

113 S.Ct. 1920. Evidence of anticompetitive intent alone cannot transform otherwise legitimate activity into a sham for this purpose. *Id.* at 59, 113 S.Ct. 1920. To qualify as a sham, litigation "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and it must conceal an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process. *Id.* at 60–61, 113 S.Ct. 1920.

■ The doctrine immunizes only actions that are directed toward governmental agencies or officials. *MCI Communications Corp. v. AT & T Co.*, 708 F.2d 1081, 1159 (7th Cir.1983). The fact that a party's act or decision "may eventually provoke agency action or review does not alone call the *Noerr–Pennington* doctrine into play." *Id.* at 1160. Acts that are "reasonably and normally attendant upon protected litigation" are entitled to immunity to the same extent as the related litigation. *Matsushita Elec. Corp. v. Loral Corp.*, 974 F.Supp. 345, 359 (S.D.N.Y. 1997).

Bell's argument is based on its assertion that Paragraph 56(f) charges it with " 'threatening' to enforce the provisions for termination charges in multi-year agreements signed by Bell Atlantic's customers." Motion for Summary Judgment at 3. However, there is no allegation of a threat in that subparagraph of the First Amended Complaint. Bell argues that its position on the issue raised by Paragraph 56(f) has been upheld by the FCC and two state agencies and, therefore, could not have been a "sham." *Id.* at 5. If accurate, that argument is simply beside the point for purposes of application of the *Noerr–Pen-*

---

**6.** CTC states that it "will voluntarily dismiss" Count III. CTC's Opposition at 4 n. 1. That count has already been dismissed by the court. Affirming Order at 2. CTC also states that it "will also voluntarily dismiss its claim concerning Bell Atlantic's reduction of wholesale discounts" and "its claim of sham litigation." CTC's Opposition at 4 n. 1. CTC may not simply voluntarily dismiss any of its claims at this stage of the action. Fed. R.Civ.P. 41(a); *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir.1996). Taking CTC's statement as a motion to dismiss any claims raised in Paragraphs 41(i), 56(m), and 86(j) of its First Amended Complaint, *see Bangor Baptist Church v. State*, 92 F.R.D. 123, 125 (D.Me.1981), I recommend that the court grant the motion.

*nington* doctrine. No one is contending in this action that Bell's imposition of such penalties on customers who switch providers is a "sham." Perhaps in recognition of this fact, Bell argues in its reply memorandum that the decision to enforce this provision in its contracts with its customers is "a necessary antecedent to the filing of a suit." Bell's Reply at 2. In the absence of any indication that Bell has filed suit to enforce its interpretation of this provision, or even that it intends to do so, its expressed intent to require such payment from its customers is not an act "incidental to protected litigation" as that term is used in *Matsushita,* the authority upon which Bell relies.

Bell is not entitled to summary judgment on any antitrust claim arising out of Paragraph 56(f) of the First Amended Compliant on the basis of the *Noerr–Pennington* doctrine.

### 2. *The State Action Doctrine.*

Bell's motion for summary judgment on the basis of the state action doctrine is directed to Paragraphs 41(d), 41(e), 56(f) and 56(g) of the First Amended Complaint.[7] Motion for Summary Judgment at 7. The substance of Paragraph 56(f) has been set forth above. The remaining paragraphs identified by Bell provide:

> Bell Atlantic has imposed the following unreasonable conditions and limitations, among others, on the resale of its telecommunications services:
>
> \* \* \* \* \* \*
>
> d. It refuses to sell IntraLATA telecommunication services at wholesale prices to Resellers, including CTC, who seek to sell to customers who have what Bell Atlantic describes as

> "contracts" with Bell Atlantic for the provision of these services, unless the customer agrees to pay unreasonable termination fees. These contracts were signed by customers prior to the Telecommunications Act of 1996 when no choices were available to customers;
>
> e. It refuses to permit customers to retain discounts under a program known as "Business Link", if customers continue to use Bell Atlantic service but switch to Resellers.
>
> \* \* \* \* \* \*

> Bell Atlantic has willfully maintained [monopoly] power by:
>
> \* \* \* \* \* \*
>
> g. Refusing to permit customers to retain discounts under a program known as "Business Link", if customers continue to use Bell Atlantic service but switch to Resellers.

First Amended Complaint, ¶¶ 41, 56.

■ The state action doctrine provides that "federal antitrust laws are subject to supersession by state regulatory programs" under certain conditions. *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 632–33, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). When a private party participating in a regime challenged under the Sherman Act claims the protection of the doctrine, a two-prong test applies: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (internal quotation marks and citation omitted).

---

7. In its reply memorandum, Bell expands this argument to include "imposition of 'unreasonable economic terms' on the sale of wholesale services," without specifying any paragraphs in the First Amended Complaint. Bell's Reply at 3. Bell's failure to include this claim in its initial motion deprived CTC of the opportunity to respond to Bell's state-action argument on this claim. As a result, the court will not consider Bell's motion for summary judgment on this claim on the basis of the state action doctrine. *Grant v. News Group Boston, Inc.,* 55 F.3d 1, 7 (1st Cir. 1995); *In re One Bancorp Sec. Litig.,* 134 F.R.D. 4, 10 n. 5 (D.Me.1991).

A private party acting pursuant to an anticompetitive regulatory program need not point to a specific, detailed legislative authorization for its challenged conduct. As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied.

*Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 64, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (internal quotation marks and citation omitted).

[W]hile a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details. Actual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law.

*Ticor,* 504 U.S. at 633, 112 S.Ct. 2169. The purpose of the "active supervision" inquiry "is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Id.* at 634–35, 112 S.Ct. 2169. "[S]tate-action immunity is disfavored, much as are repeals by implication." *Id.* at 636, 112 S.Ct. 2169.

■ Here, application of the doctrine is complicated by the fact that six states are involved, as well as the fact that state regulation of the telephone industry predates the Telecommunications Act of 1996, which first established federal statutory approval of competition in the provision of local telecommunications services. This policy seems to be fundamentally at odds with the state action doctrine, which allows for protection of anticompetitive practices in this industry under certain circum-stances. However, *Ticor,* which also predates the Act, remains the Supreme Court's most recent statement on the matter. Bell argues that its new policy of requiring payment of termination fees when customers under contract choose to switch to a reseller as the provider of Bell services and its cancellation of credits earned under the Business Link program when a customer makes the same change are both within the clearly articulated policy of each state and actively supervised by each state's utility regulatory agency.[8] Bell relies on the declaration of its expert witness, Kenneth Gordon, as factual support for this argument.

Bell contends that the first prong of the *Midcal* test is met by the existence of state laws, collected at Exhibit A to the Gordon Declaration, establishing regulatory commissions with authority over local telecommunications services in each of the seven states at issue. While these statutes do not establish a "clearly articulated and affirmatively expressed state policy," *Midcal,* 445 U.S. at 105, 100 S.Ct. 937, by specifically authorizing Bell's use of termination penalties and cancellation of Business Link credits under the circumstances set forth in the First Amended Complaint, *see Southern Motor Carriers,* 471 U.S. at 63, 105 S.Ct. 1721, it is possible that this prong of the *Midcal* test is met in each of these states by the respective statutes' providing each state agency with the authority and discretion to implement broad state policy that may include these particular actions, *id.* at 63–64, 105 S.Ct. 1721. CTC's argument that the states are not authorized "to ignore the antitrust laws," CTC's Opposition at 9–10, is beside the point here. CTC also relies on *AT & T v. IMR Capital Corp.,* 888 F.Supp. 221 (D.Mass.1995), in which the court stated that the theoretical power of the state regulatory agency to regulate the behavior at issue is insufficient "to make such behavior the state's own, and immunize it

---

8. The Business Link program is not available in Vermont. Gordon Dec. ¶ 21(b). Neither party appears to find this significant in connection with the state action issue.

from federal law." *Id.* at 240. However, it appears that the court is discussing the second prong of the *Midcal* test at that point in the *IMR* decision, not the first.

Assuming *arguendo* that the first prong of the *Midcal* state action test is met in this case by the existence of state statutes establishing regulatory commissions in each of the seven states with the power to regulate Bell's Business Link program and its ability to charge termination penalties in connection with long-term service contracts, Bell fails to provide undisputed evidence that these states each actively supervise the challenged actions. If the particular action at issue was never authorized by the state regulatory commissions, there can be no active state supervision that immunizes the actions from antitrust liability under the state action doctrine. *IMR*, 888 F.Supp. at 240.

Bell's position is seriously undermined by the undisputed facts that it did not charge the termination penalties at issue until January 1998, Mahan Dec. ¶ 23, and did not refuse to allow Business Link customers to retain their discounts if they switched to a reseller until May 1998, *id.* ¶ 27. None of the state tariffs submitted by Bell appears to have changed in January or May 1998. Gordon Dec. ¶¶ 17, 21 & Exhs. B & C. Accordingly, Bell's change in policy on these issues could not have been actively supervised by the state regulatory commissions, because it was not authorized by those commissions. In addition, the parties dispute whether the state tariffs address the ability of Bell to charge a termination fee to customers who seek to assign their contracts with Bell to CTC, *compare* TerKuerst Dec. ¶ 28 and Declaration of Jordan Bradley Michael in Opposition to Bell Atlantic's Motion for Summary Judgment ("Michael Dec."), Exh. DD to

CTC's Opposition, ¶ 7 *with* Reply Declaration of Kenneth Gordon in Support of Bell Atlantic's Motion for Summary Judgment ("Gordon Reply Dec.") (Docket No. 116) ¶¶ 3, 5 & Exhs. 1 & 2; and the ability of Bell to refuse to allow Business Link customers to retain their discounts if they switch to a reseller as the provider of those Bell services, *compare* Michael Dec. ¶ 9 *with* Gordon Reply Dec. ¶ 8 & Exh. 3. This is not merely a dispute concerning a material fact, however. Interpretation of a tariff is a question of law. *Rebel Motor Freight, Inc. v. ICC*, 971 F.2d 1288, 1290 (6th Cir.1992). Accordingly, this court is in a position to resolve the parties' dispute on this point at this time.

After reviewing the specific tariff sections identified by Bell as providing evidence of active state regulatory agency supervision of its policies of termination charges and loss of Business Link discounts, I conclude that the tariffs do not specifically authorize either policy. The portions of those tariffs that refer to termination charges uniformly refer to termination of the service at issue. *E.g.*, Gordon Reply Dec. Exh. 1 at [1], [9] (New York); [13] (Massachusetts); [21] (Rhode Island); [24] (Vermont); [40] (New Hampshire); Gordon Reply Exh. 2 at [2] (New York); [5] (Maine); [7] (Massachusetts); [9] (New Hampshire); [11] (Rhode Island); [13] (Vermont). What is at issue here is not termination of the service provided to the customer, but only a change in the provider who is paid for the service by the customer. The service remains the same, and the net income to Bell remains approximately the same. Accordingly, the tariffs do not authorize Bell to charge termination fees under the circumstances at issue.[9] The same is true of the portions of

---

9. While I do not rely on them, I note that my conclusion is in accordance with those of the three state regulatory commissions that have ruled to date on this issue in proceedings initiated by CTC. Massachusetts Department of Public Utilities, D.T.E. 98–18, Ruling dated July 2, 1998, Exh. HH to CTC's Opposition;

New York Public Service Commission, Case 98–C–0426, Order Granting Petition effective September 14, 1998, enclosed in letter to the court from Rodger D. Young, Esq., dated October 23, 1998 ("Young Letter"); New Hampshire Public Utilities Commission, DR 98–061, Order Permitting Assignment of Certain Re-

the state tariffs concerning the Business Link program upon which Bell relies. Those tariffs allow forfeiture of earned credits only when the service agreement is terminated. *E.g.*, Gordon Reply Dec. Exh. 3 at [2] (Massachusetts); [3] (Maine); [5] (New Hampshire); [8] (Rhode Island); [9] (New York). Under the scenario presented by CTC, the service agreement is not terminated but is merely assigned by the customer to CTC. Again, the service remains the same and the effective income to Bell remains the same. These tariffs do not authorize Bell to refuse to transfer the earned credits when the customer assigns its Business Link contract to CTC.

Failure to meet the second prong of the *Midcal* test requires the court to deny Bell's motion for summary judgment on the basis of the state-action doctrine.

### 3. The Filed Rate Doctrine.

Bell asserts that it is entitled to summary judgment on any claims arising from the following paragraphs of the first amended complaint under the filed rate immunity doctrine: 41(c), 41(d), 41(e), 41(h), 56(e), 56(f), 56(g) and 56(j). Motion for Summary Judgment at 10. Paragraphs 41(d), 41(e), 56(f) and 56(g) are set forth above. The text of the remaining paragraphs addressed by Bell in this argument follows:

41. In addition, Bell Atlantic has imposed the following unreasonable conditions and limitations, among others, on the resale of its telecommunications services:

\* \* \* \* \* \*

c. It refuses to sell at wholesale prices FCC-tariffed data services to Resellers, including CTC, who seek to sell these services to customers who have purchased or desire to purchase an FCC tariffed data service;

\* \* \* \* \* \*

h. It has imposed unreasonable economic terms on the payment for Resellers [sic] for Bell Atlantic's IntraLATA telecommunications services.

\* \* \* \* \* \*

56. Prior and subsequent to the passage of the Telecommunications Act of 1996, Bell Atlantic has willfully maintained [monopoly] power by:

\* \* \* \* \* \*

e. Refusing to sell at wholesale prices FCC-tariffed data services to Resellers, including CTC Communications, who seek to sell these services to customers who have purchased or desire to purchase an FCC tariffed data service;

\* \* \* \* \* \*

j. Imposing Resellers unreasonable economic terms on the payment of Bell Atlantic's IntraLATA telecommunication services. [Sic.]

Bell contends that each of the specified paragraphs deals with the "prices and terms of Bell Atlantic's service offerings," and that each of the practices challenged in these paragraphs is "fully consistent with Bell Atlantic's FCC and state approved tariffs." Motion for Summary Judgment at 10.

■ The filed rate doctrine "forbids a regulated entity to charge rates for services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). At the heart of the doctrine is a policy of nondiscriminatory rates which is violated when similarly situated customers pay different rates for the same services. *AT & T v. Central Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 1963, 141 L.Ed.2d 222 (1998). As all exemptions from the antitrust laws are to be "strictly construed and strongly disfa-

---

tail Customers, Order No. 23,040, dated October 7, 1998, enclosed in Young Letter. Bell states, without evidentiary support, that the

Massachusetts order has been stayed and Bell's petition for reconsideration by that agency granted. Bell's Reply at 7 n. 7.

vored," *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), this doctrine must be applied with care. In support of its defensive use of the doctrine, Bell relies on *Fax Telecomm., Inc. v. AT & T,* 138 F.3d 479 (2d Cir.1998), and *Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir.1990).[10] In *Fax*, the plaintiff sought to enforce its alleged agreement with AT & T to receive long-distance service at rates lower than the rate on file with the FCC for those services. 138 F.3d at 488. Realizing that the court could not directly enforce those rates, the plaintiff asked the court to enforce AT & T's promise to file a tariff that included those rates. *Id.* at 489. The Second Circuit held that this request also violated the filed rate doctrine, and that the plaintiff had failed to show that its claimed reliance on the promise was reasonable. *Id.* at 490. In *Concord,* the filed rate doctrine was not at issue.

CTC argues in response that Bell's actions concerning the termination charges, Business Link discounts, imposition of "unreasonable economic terms" for intra-LATA services and sale of FCC-tariffed services[11] were anticompetitive non-rate activity that might coincidentally implicate promulgated rates but would not be protected from antitrust liability, citing *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1159–60 (3d Cir.1993).

The basic questions to be asked by the court in analyzing Bell's argument here are whether the actions challenged by CTC "embody disagreement with rates or procedures embodied in a filed tariff," *MCI Telecomms. Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 132 (D.N.J.1995), and whether allowing CTC to proceed with its claims will result in discrimination in favor of CTC against other customers of Bell, *Cooperative Communications, Inc. v. AT & T,* 867 F.Supp. 1511, 1519 (D.Utah 1994).

The parties vigorously dispute the first point. I have already determined that Bell's actions with respect to termination charges and Business Link credits are not governed by the filed tariffs submitted by Bell. Allowing CTC to proceed with these two claims will not result in discrimination in favor of CTC against other wholesale customers of Bell. Accordingly, Bell is not entitled to summary judgment on the basis of the filed rate doctrine as to these two claims.

As for the claim concerning FCC-tariffed services, Bell contends that the carrier access services at issue are governed by an FCC tariff and that a local competition order issued by the FCC concludes that such services are not subject to the resale requirements added to 47 U.S.C. § 251(c)(4) by the Telecommunications Act of 1996. CTC responds only that the order "alone cannot support judgment against CTC based on the Filed Rate Doc-

---

**10.** Like the state action doctrine also invoked by Bell, the filed rate doctrine

> is plainly a creature of a different time. The Supreme Court has recognized that 'although the filing requirement prevented price discrimination and unfair practices' when AT & T held a monopoly in long-distance telecommunications, strict application of the filed rate doctrine 'frustrates those same goals' in today's era of deregulation and multiple competing carriers. *MCI Telecomms. Corp. v. AT & T,* 512 U.S. 218, 233, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).... In practice, as this case illustrates, the filed rate doctrine may lead to results that are quite unjust. But ... this court is not the proper forum in which to

> resolve the problem. Unless and until Congress or the Supreme Court reexamines the doctrine, we are bound to enforce it.

*Fax,* 138 F.3d at 491.

**11.** The "FCC-tariffed" services to which CTC refers are apparently "carrier access services." Plaintiff's Response to Defendant's Second Interrogatories to Plaintiff CTC Communications Corp., Exh. B to Bell's SMF, Answer 8 at 14. The intraLATA services listed in Paragraph 56(j) of the First Amended Complaint are not further defined in the summary judgment record and, unlike the services in all of the other paragraphs subject to Bell's filed rate argument, are not separately addressed in Bell's written submissions.

trine," CTC's Opposition at 16, and that Bell's failure to refer to a specific tariff means that it is not entitled to summary judgment on this claim. Bell has provided a citation to a specific FCC tariff with its reply memorandum.

CTC does not explain why the FCC Order, First Report and Order, In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499, 1996 WL 452885 (Aug. 8, 1996), and specifically paragraphs 873 and 874 of that order, cannot support judgment based on the filed rate doctrine. Courts have routinely relied upon orders of the FCC as authority. *E.g., Kessler v. Town of Niskayuna,* 774 F.Supp. 711, 714–17 (N.D.N.Y.1991). The FCC's determination that exchange access services are not subject to the resale requirements of 47 U.S.C. § 251(c)(4) does not end the inquiry concerning an antitrust violation, however, because that conclusion only means that Bell is not required to sell such services at wholesale by the Act. The filed rate doctrine still requires that an existing tariff set a rate for sale of the specific service at issue.

Bell has provided undisputed evidence that carrier access services are subject to a tariff entitled NYNEX Telephone Companies FCC # 1. Gordon Dec. ¶ 23. The brief excerpt from that tariff provided by Bell, Exhibit 4 to the Gordon Reply Declaration, is fairly cryptic. The unchallenged interpretation of that tariff by Bell's expert witness, however, is sufficient to establish that the tariff does cover the services at issue and requires that the services be sold at retail. Gordon Reply Dec. ¶ 10. I therefore conclude that Bell's refusal to make such services available to CTC at wholesale rates is required by rates or procedures embodied in a filed tariff and that allowing CTC to proceed with this claim could result in discrimination in favor of CTC against other customers of Bell, who would be required by the tariff to purchase the services at retail prices. Bell is entitled to summary judg-

ment on the antitrust claims raised in Paragraphs 41(c) and 56(e) of the First Amended Complaint.

Bell's entire presentation in support of its motion for summary judgment on Paragraphs 41(h) and 56(j) of the First Amended Complaint on the basis of the filed rate doctrine consists of a conclusory assertion that Bell's practice in this regard (imposing unreasonable economic terms on payment for intraLATA services) "is fully consistent with Bell Atlantic's FCC and state approved tariffs," Motion for Summary Judgment at 10, and a footnote in its reply, in which it asserts that "in New York, Bell Atlantic may only sell its services in accordance with filed tariffs. In New England, the wholesale discounts (and other terms of resale) are either approved or, if necessary, prescribed by state commissions," Bell's Reply at 6 n. 6. The fact that CTC has chosen not to reply to Bell's argument on this claim does not mean that summary judgment may enter for Bell without further consideration by the court. *Redman v. FDIC,* 794 F.Supp. 20, 22 (D.Me.1992). While the information provided with Bell's reply supports its truncated presentation on this issue, Gordon Reply Dec. ¶ 11, it was only in Bell's reply memorandum that the evidentiary basis for it argument concerning this claim became apparent. Under the circumstances, and in the absence of citation by Bell to the particular sections of particular tariffs that it contends provide the basis for summary judgment under the filed rate doctrine, I conclude that it is not possible for the court to determine whether the challenged action embodies disagreement with rates or procedures included in a filed tariff, *Graphnet,* 881 F.Supp. at 132, and accordingly, Bell is not entitled to summary judgment on these claims.

### 4. Primary Jurisdiction

Bell seeks summary judgment on the following paragraphs of the First Amended Complaint under the primary jurisdiction doctrine: 41(a)–(e), 41(g)–(i), 56(c)–(g),

56(i) and 56(*l*). Motion for Summary Judgment at 15.[12] CTC has indicated that it will not proceed with the claim based on Paragraph 41(i). The text of the other paragraphs included in this list[13] not set forth earlier in this recommended decision follows:

41. In addition, Bell Atlantic has imposed the following unreasonable conditions and limitations, among others, on the resale of its telecommunications services:

a. It refuses to sell voice mail at wholesale or retail prices to Resellers, including CTC, in all of the New England states, although it provides these services to customers at retail and even offers these services at wholesale to Resellers in New York;

b. It refuses to sell or provide voice mail even at retail prices to customers who buy IntraLATA telecommunication services from Resellers;

\* \* \* \* \* \*

g. It has refused to allow Resellers to communicate with technical design, engineering and support personnel to aid in the resale of Bell Atlantic's IntraLATA telecommunications services.

\* \* \* \* \* \*

56. Prior and subsequent to the passage of the Telecommunications Act of 1996, Bell Atlantic has willfully maintained [monopoly] power by:

\* \* \* \* \* \*

c. Refusing to sell voice mail at wholesale or retail prices to Resellers, including CTC Communications, in all of the New England states, although it provides these services to customers at retail and even offers these services at wholesale to Resellers in New York;

d. Refusing to sell or provide voice mail even at retail prices to customers who buy Bell Atlantic's Intra-LATA telecommunications services through Resellers;

\* \* \* \* \* \*

i. Refusing to allow Resellers to communicate with Bell Atlantic's technical design, engineering, and support personnel to aid in the resale of Bell Atlantic's IntraLATA telecommunication services;

\* \* \* \* \* \*

l. Executing noncompetition covenants which unreasonably prevent or limit competition for the resale of Intra-LATA services.

The primary jurisdiction doctrine is specifically applicable to claims properly cognizable in court that contain some issue within the special competence of

---

**12.** Bell's assertion that I recommended denial of its motion to dismiss on this ground "because the state commissions rather than the FCC were the primary regulators here," Motion for Summary Judgment at 15 n. 6, is incorrect. My analysis at that time quite clearly and carefully raised but did not resolve the question whether application of the primary jurisdiction doctrine is appropriate when the regulatory agency involved is a state agency rather than a federal one. Recommended Decision on Defendant's Motion to Dismiss ("Rec.Dec.") (Docket No. 46) at 10–12.

**13.** In its reply memorandum, Bell appears to extend its primary jurisdiction argument to include "any remaining allegations of wrongful conduct under ... the antitrust laws."

Bell's Reply at 7. The only subparagraphs of paragraphs 41 and 56 of the First Amended Complaint not addressed specifically in the motion for summary judgment or the court's order on Bell's motion to dismiss are Paragraphs 41(f) and 56(h) and (k). Bell argues that any allegations in Paragraph 56(k) should be "dismissed" because "CTC's experts point to no injury either to competition or to CTC based on this conduct." *Id.* at 2 n. 2. This paragraph will accordingly be discussed in section III(B)(7), *infra,* in the context of Bell's more general argument to this effect. My conclusions set forth in this section apply equally to Paragraphs 41(f) and 56(h), which deal with Bell's alleged refusal to allow CTC to publish the fact that it has authority to market and resell Bell services.

an administrative agency. It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.

*Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The court may retain jurisdiction or, "if the parties would not be unfairly disadvantaged," dismiss the case without prejudice. *Id.* Bell apparently seeks the latter alternative, stating that the court "should grant summary judgment dismissing CTC's antitrust and Telecommunications Act [14] claims in deference to the primary jurisdiction of the FCC and state commissions," Motion for Summary Judgment at 18, and later asserting that CTC "already has initiated proceedings on claims, repeated in this suit, in *each* of the six states at issue here." Bell's Reply at 7 n. 7 (emphasis in original).

Prior agency determination of certain issues in dispute between the parties may aid the court in deciding whether an antitrust claim is available to a plaintiff. *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 305, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). The doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The FCC was "created by Congress specifically to enforce the provisions of the Communications Act of 1934," *IMR Capital Corp.,* 888 F.Supp. at 244, of which 47 U.S.C. § 251 is by amendment a part. The state public utility commissions have jurisdiction over telecommunications services within their borders. *See Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 359, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (Communications Act

"establishes ... a system of dual state and federal regulation over telephone service").

The First Circuit has stated that the doctrine of primary jurisdiction is intended to serve "as a means of coordinating administrative and judicial machinery" and to "promote uniformity and take advantage of agencies' special expertise." *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir.1979). There are three factors that guide the decision whether to defer a matter to an agency under the doctrine:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Massachusetts v. Blackstone Valley Elec. Co.,* 67 F.3d 981, 992 (1st Cir.1995), quoting *Mashpee Tribe,* 592 F.2d at 580–81. Also important in any consideration of possible deference is the avoidance of conflict and whether there is some urgency— whether "[o]ngoing business conduct is likely to be involved and harm, possibly irreparable, may be accruing." *PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 80 (1st Cir.1996).

I have already concluded that the doctrine of primary jurisdiction is not applicable to CTC's claims insofar as the FCC is identified as the agency to which this court should defer, Rec.Dec. at 10, and that recommended decision was adopted by the court, Affirming Order at 2. This analysis accordingly will focus on the possibility of deferral to state agencies for the seven claims in the First Amended Complaint identified by Bell as subject to its motion on this basis. There are two basic problems with Bell's position: it requires deferral to seven separate state agencies and there is no evidence in the summary judg-

---

**14.** Bell's motion for summary judgment on CTC's claims under the Act will be discussed

in section III(C), *infra.*

ment record that all seven issues have been placed before those agencies.

Bell argues that deferral to the state agencies is required in this case. However, the First Circuit has used mandatory language only when the reasonableness of a tariff is at issue. *E.g., Delta Traffic Serv., Inc. v. Transtop, Inc.,* 902 F.2d 101, 103 (1st Cir.1990). Here, CTC has not challenged the reasonableness of any state tariffs governing Bell's provision of services. To the contrary, CTC argues that Bell's tariffs do not extend to the actions it contends constituted violations of the Sherman Act. If that is the case, the expertise of the seven state agencies involved is not required to unravel intricate technical facts. The court can read the tariffs and determine whether they extend to the factual situations presented by the parties.

■ In addition, Bell relies on case law in which the courts have applied the doctrine of primary jurisdiction to defer to a single state agency on a given issue. Here, Bell asserts that "termination liability" is presently being contested before state agencies in Massachusetts, Maine, New Hampshire, New York, Rhode Island and Vermont, Gordon Dec. ¶ 20, and that Business Link "is subject to immediate administrative review at CTC's demand," an assertion that is not supported by the citation to the Gordon Declaration given by Bell, Bell's Reply at 7 n. 7. Even if these were the only two issues on which Bell sought deferral, and if the issues were also pending in Connecticut, there is no guarantee that all seven agencies would rule in the same manner, and certainly no guarantee that all would do so within a relatively short time. Deferral under these circumstances, particularly when there are other issues in dispute which, for all that is shown in the summary judgment

record, have not been brought before the state agencies and possibly could not be,[15] could not possibly serve the purpose of uniformity that is at the heart of the doctrine of primary jurisdiction as set forth in *Mashpee Tribe,* 592 F.2d at 580. Balancing the advantages of applying the doctrine against the potential costs arising from complications and delay in the agency proceedings, *National Communications Ass'n, Inc. v. AT & T,* 46 F.3d 220, 223 (2d Cir.1995), I conclude that such costs outweigh any possible advantage inherent in application of the doctrine of primary jurisdiction to seven of the specific claims raised in this proceeding by CTC. *See also Red Lake Band of Chippewa Indians v. Barlow,* 846 F.2d 474, 476 (8th Cir.1988) (doctrine is to be applied sparingly). Bell is not entitled to summary judgment on those claims on this basis.

5. *Evidence of Monopolization or Attempted Monopolization*

Bell next argues that there is no evidence to support CTC's claims concerning monopolization. Bell does not identify any paragraphs or subparagraphs of the First Amended Complaint in which such claims are raised. It appears from a reading of the First Amended Complaint that such claims are raised only in Count II. To establish a claim of monopolization, a plaintiff must show

(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct.

---

**15.** For example, one of the allegations in the First Amended Complaint that Bell contends is subject to deferral under the primary jurisdiction doctrine is that Bell has refused to allow resellers to communicate directly with its technical personnel concerning the intra-LATA communications services that the resell-

ers have sold to end users. First Amended Complaint ¶¶ 41(g), 56(i). Bell has not suggested in any of its submissions in connection with this motion that such communication is a matter subject to filed tariffs or committed to administrative agency determination by statute.

2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Specifically, Bell argues that CTC cannot provide evidence that Bell has sufficient market power in an appropriately defined market to allow a jury to decide whether Bell has an illegal monopoly or has attempted to obtain a monopoly. Motion for Summary Judgment at 18. Bell's expert witnesses and CTC's expert witnesses differ on the question of the definition of the appropriate market. At first glance, therefore, this appears to be a classic situation in which summary judgment is not appropriate. *See, e.g., Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1112 (8th Cir.1997).

■■■ Market definition in the antitrust context is a question of fact that may only be resolved on summary judgment if the record does not present any dispute of material fact. *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F.Supp. 617, 645 (E.D.Pa.1997). *See also Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984). Bell argues that the definition of the relevant market provided by CTC's experts is erroneous as a matter of law and internally inconsistent, and that for either reason Bell is entitled to summary judgment.

On the first point, Bell essentially argues that, because its alleged anticompetitive conduct is "directly regulated by the government," it is impossible, except under extraordinary circumstances, for its conduct to violate the Sherman Act. Motion for Summary Judgment at 19–21. Bell relies on *Town of Concord* as support for this argument. Of course, *Town of Concord* was decided well before the Telecommunications Act of 1996 was enacted, and Bell's argument ignores the fact that the whole point of much of CTC's complaint is that the conduct alleged to be anticompetitive is not regulated by any government agency. The issue decided in *Town of Concord* was "whether a pricing practice known as a price squeeze violates the anti-

trust laws when it takes place in a fully regulated industry." 915 F.2d at 18. A firm can engage in a price squeeze only if it operates as both a retailer and a wholesaler whose customers are also its competitors. *Id.* A price squeeze occurs when that firm's price as a wholesaler is too high or as a retailer is too low for the competitor to stay in business. *Id.* The case only dealt with an industry that was fully regulated—where prices are regulated at both the retail and the wholesale levels. *Id.* at 19. The First Circuit held that effective price regulation at both levels made it likely that a price squeeze would constitute an exclusionary practice under the Sherman Act. *Id.*

Contrary to Bell's position, the facts in the summary judgment record do not place the case at hand "comfortably within the *Town of Concord* paradigm." Motion for Summary Judgment at 21. Pricing is only one of the issues alleged in the First Amended Complaint to be anticompetitive conduct, and Bell has made no showing that its prices for wholesale products are fully regulated. *Town of Concord* in fact provides little guidance to this court for this case.

In *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir.1996), the First Circuit noted:

Substantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against a rival's entry or expansion that would erode such supracompetitive prices and profits. Market power can be shown through two types of proof. A plaintiff can either show direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output) or circumstantial evidence of market power. Market power may be proved circumstantially by showing that the defendant has a dominant market share in a well-defined relevant market and that there are significant barriers to entry in that market and that

existing competitors lack the capacity to increase their output in the short run. *Id.* at 196–97 (internal punctuation and citations omitted). Here, CTC has offered evidence to make such a circumstantial case, sufficient to avoid the entry of summary judgment on this issue. *See also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal." (Internal quotation marks omitted.))

■■■ Bell attacks this conclusion by arguing that the testimony of CTC's experts[16] on market power is economically unreasonable, making it insufficient to support a jury verdict, citing *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir.1995). The testimony is economically unreasonable, according to Bell, because CTC's experts do not include PBX and Key systems, interLATA (long-distance) services, and wireless mobile services in their definition of the relevant market. Motion for Summary Judgment at 23–25. CTC offers evidence that long distance service and cellular telephone service are not in the same relevant product market as local telephone service, which is the market in which CTC, by the terms of the First Amended Complaint, seeks to compete with Bell. *See, e.g.*, Declaration of Gregory L. Rosston in Support of CTC Communications' Opposition to Bell Atlantic's Motion for Summary Judgment, Exh. G to CTC's Opposition, ¶¶ 15–17, 20. Bell has established nothing beyond a battle of the experts on this issue, and is accordingly not entitled to summary judgment. While the testimony concerning PBX and Key systems and whether they should be included in the relevant market is less clear than that concerning long distance and cellular service, *compare id.* ¶ 21 *and* Rule 30(b)(6) Deposition of CTC Communications Corp. by David E. Mahan, excerpt attached as Exh. C to Bell's SMF, at 49, it is not the role of the court on a motion for summary judgment to assign weight to the evidence. In addition, Bell makes no showing that inclusion of PBX and Key systems in the relevant market would necessarily result in the conclusion that Bell neither holds nor has attempted to hold a monopoly in that market. Similarly, if the testimony of CTC's experts is internally inconsistent, that fact goes to the weight of their testimony, not its admissibility. Bell is therefore not entitled to summary judgment on the basis of alleged deficiencies in CTC's expert testimony concerning the relevant market.[17]

**16.** Bell also argues in passing that the testimony of CTC's experts is inadmissible under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because those experts fail "to take into account the central fact of this case: Bell Atlantic's nature as a pervasively regulated public utility." Motion for Summary Judgment at 23 n. 9. To the contrary, the testimony of CTC's experts that is presented in the summary judgment record meets the *Daubert* test for admissibility: the experts appear qualified, their testimony concerns specialized knowledge, and their testimony would assist the trier of fact. *United States v. Shay*, 57 F.3d 126, 132 (1st Cir.1995). If the testimony in fact fails to take into account the fact that Bell is subject to regulation and if that fact is central to this case, those facts go to the

weight of their testimony, not its admissibility.

**17.** Bell's citation to authority for its argument that market share should be at most a point of departure in determining the existence of monopoly power in a regulated industry, *Southern Pac. Communications Co. v. AT & T*, 740 F.2d 980, 1000 (D.C.Cir.1984), does not affect this conclusion. First, Bell suggests that the remaining factors to be considered are the power to control prices or exclude competition. Bell's Reply at 10. CTC's experts offer testimony concerning their conclusions that Bell has excluded competition by engaging in the actions challenged by CTC. Second, *Southern Pacific* was decided twelve years before the Telecommunications Act of 1996 changed national policy to make competition in the provision of local telephone service a

*6. Evidence of Anticompetitive Effect.*

Bell's next argument for summary judgment on Count II of the First Amended Complaint is that CTC has produced no evidence that any of Bell's challenged actions or inactions have foreclosed a substantial amount of commerce in any relevant market and that the testimony of CTC's experts to the effect that Bell's challenged actions or inactions are unreasonable and anticompetitive should be excluded due to a lack of basis in economic theory "or any other recognized discipline." Motion for Summary Judgment at 27. Bell specifically attacks CTC's claims regarding voice mail, termination penalties and lack of direct access to technical support, as well as the expert testimony of Duncan Simester, in this regard.[18] Again, Bell's experts disagree with CTC's experts on this issue.

■ In order to violate the Sherman Act, a restraint on competition must be "shown to have or [be] intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 501, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Because the antitrust laws were designed to protect competition, not competitors, *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), a practice is "anticompetitive" only if it harms the competitive process, *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1182 (1st Cir.1994). The First Circuit also uses the term "exclusionary conduct," which it defines as "conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or

maintaining monopoly power." *Town of Concord,* 915 F.2d at 21 (internal quotation marks and citation omitted). Injury to competition may be measured by a reduction in output and an increase in prices in the relevant market, and more generally by decreased efficiency in the market that has a negative impact on consumers. *Sullivan v. National Football League,* 34 F.3d 1091, 1097 (1st Cir.1994). "[O]therwise innocent or ambiguous behavior may violate the Sherman Act when considered together with the remainder of the conduct." *United States v. AT & T,* 524 F.Supp. 1336, 1344 (D.D.C.1981). Proof of predatory intent allows an inference of anticompetitive effect. *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 831 (9th Cir.1971).

CTC resists Bell's attempt to focus the court's attention on individual factual claims for analysis with respect to the issue of competitive injury. It relies on *United States v. AT & T* to support its contention that for purposes of summary judgment the court should examine only the pattern of alleged actions and not each individual action alleged. 524 F.Supp. at 1343–44. Because CTC lists actions other than Bell's refusal to sell its voice mail at wholesale or to retail customers who purchase other services from resellers, Bell's imposition of termination penalties on customers who wish to assign their long-term service contracts with Bell to CTC, and Bell's refusal to allow CTC direct access to its technical support personnel, the only claims discussed by Bell in its motion on this point, CTC's position is persuasive. I will nevertheless briefly address each of Bell's arguments.

■ With respect to Bell's voice mail, Bell argues that its share of the market for

---

possibility as well as a goal. The nature of monopoly power must by definition be changed when the environment for the possible exercise of that power has changed so fundamentally.

18. Bell also seeks summary judgment on this basis on CTC's claims alleging a tying arrangement involving voice mail and Centrex. Motion for Summary Judgment at 29. This claim, set forth in Count III of the First Amended Complaint, has already been dismissed. Affirming Order at 2.

voice mail is only 3%, Excerpt from Deposition of Jacob Goldberg, Exh. E to Bell's SMF, at 134,[19] making it impossible, according to Bell, for its refusal to make its voice mail available to harm the competitive process. The basis for the 3% figure is not clear from Goldberg's testimony. CTC offers evidence that one-third of the Centrex customers in New England subscribe to Bell's voice mail, and that Bell's policy prevents 45% of these customers from switching to resellers as their primary providers of local telephone service. Rosston Dec. ¶ 51; Declaration of Dr. Duncan Simester ("Simester Dec."), Exh. II to CTC's Opposition, ¶ 5. Even if Bell's voice mail policy were considered separately, CTC has provided sufficient evidence to avoid the entry of summary judgment on this claim on the ground asserted by Bell.

Bell next asserts that its imposition of termination penalties does not foreclose a substantial amount of commerce in the relevant market. Accepting CTC's definition of the relevant market for this claim and treating the contracts at issue as exclusive dealing arrangements, Bell argues that CTC must still make a "compelling showing of foreclosure of substantial amounts of trade in the relevant market" in order to avoid the entry of summary judgment on this claim, citing *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 595 (1st Cir.1993). Motion for Summary Judgment at 30. CTC cannot do so, Bell contends, because its experts, Rosston and Hall, testified at deposition that they do not know what portion of the relevant market is subject to such contracts. *Id.* at 30–31. In *U.S. Healthcare,* a case that did not involve a former monopoly provider newly subject to a federal statutory preference for competition, the First Circuit stated that under the circumstances assumed here by Bell, "proof of substantial foreclosure and of probable immediate and future effects is the essential basis under *Tampa [Elec. Co. v. Nashville Coal Co.,*

365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961),]* for an attack on an exclusivity clause." 986 F.2d at 597. Here, CTC has offered some evidence both of substantial foreclosure and of probable immediate and future effects. Simester Dec. ¶ 5 (72% of users of access lines would be prevented from switching to resellers by termination penalty); Rosston Dec. ¶¶ 58–59 (88% of business user contracts are for 3 years or longer and many customers have multiple long-term contracts that do not end in the same year, making access by a competitor in face of the termination penalty "nearly impossible"). This is sufficient evidence on the point to avoid the entry of summary judgment.

CTC's evidence concerning Bell's refusal to allow direct access to its technical support personnel with respect to the impact of this policy on competition is minimal. CTC offers only the statement of Mahan, its Vice President of Market Planning and Development, that "[t]his lack of direct access impacts CTC's customer service, product quality and adds delay to CTC's provisioning of resold services to its customers." Mahan Dec. ¶¶ 2, 26. Standing alone, this assertion would not provide sufficient evidence of injury to competition. However, it may be considered in combination with other actions and failures to act which CTC alleges constitute a pattern of anticompetitive action in order to establish such an injury.

Finally, Bell argues that Simester's testimony must be excluded as "irrelevant and unreliable." Motion for Summary Judgment at 32. While this appears to be a matter more suitable for a motion *in limine* than assertion as a ground for summary judgment, I will address it here because the testimony provides a partial basis for CTC's opposition to the motion for summary judgment. Bell claims that Simester's methodology has "patently obvious flaws," *id.* at 33, apparently the asserted facts that Simester interviewed only 6%

---

**19.** Bell uses a figure of 3.4%, Motion for Summary Judgment at 28, but only 3% is supported by the authority cited by Bell, Goldberg's deposition testimony.

of the companies in his sample and that his sample included only customers who formerly had agency agreements with CTC. Bell cites no authority for this argument. CTC responds that Simester's actual response rate was 17%, well within the acceptable range for such studies, and that whether the customer previously had a contractual relationship with CTC has no effect on Simester's conclusions. Simester Dec. ¶¶ 8–13. At most, Bell has presented an issue of the weight to be accorded to Simester's testimony at trial. It has not established a basis for excluding the testimony from the summary judgment record.

Bell is not entitled to summary judgment on the basis of lack of evidence of anticompetitive effect.[20]

### 7. Evidence of Antitrust Injury

■ Again presumably attacking Count II, Bell next argues that it is entitled to summary judgment because CTC has failed to produce evidence of antitrust injury. While it is certainly accurate to say, as Bell does in beginning its argument on this basis, that a plaintiff seeking recovery under the antitrust laws "must prove the existence of *antitrust* injury, *i.e.*, injury of the type the antitrust laws were intended to prevent," *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (internal quotations marks and citation omitted; emphasis in original), Bell so limits its presentation of CTC's claim of antitrust injury that its ensuing argument has little or no merit. Bell contends that CTC claims antitrust injury only to the extent that it was required to comply with a temporary restraining order issued by the

court in the action brought by Bell in the Southern District of New York that has now been consolidated with this action.[21] Motion for Summary Judgment at 34–35. CTC quite properly points out that it has alleged antitrust injury caused not by the New York court's order but by Bell's imposition of the covenant not to compete contained in the Agency Agreement in a manner now rejected by this court, Decision on Motion to Dissolve TRO, etc. at 26. CTC's Opposition at 35. Because CTC has not alleged antitrust injury in the only manner which Bell raises as the ground for its motion for summary judgment, Bell is not entitled to summary judgment on this basis.

### 8. Refusal to Deal.

Bell asserts that "most of CTC's antitrust claims fail because under the antitrust laws, there is never a duty to offer a competitor a product or service at a wholesale price, and there is only seldom a duty to assist a competitor." Motion for Summary Judgment at 35. Bell does not identify which of CTC's claims are not subject to this argument, and it specifically mentions only the claims regarding Bell's voice mail, its refusal to allow direct access to its support personnel, and its refusal to allow transfer of Business Link credits as claims that must fail under this theory. *Id.* at 36; Bell's Reply at 10. None of the case law cited by Bell arises from a factual situation in which a previously regulated monopoly is required by statute to participate in the development of competition for its services.

**20.** One exception to this result might be the claim for disparagement set forth in Paragraph 56(k) of the First Amended Complaint, as to which Bell contends there is no evidence of injury either to competition or to CTC. Bells' Reply at 2 n. 2. However, Bell failed to raise this issue in its initial motion, and, as previously noted, it is not entitled to summary judgment on the basis of an issue argued for the first time in its reply memorandum. *Grant,* 55 F.3d at 7.

**21.** Information concerning the New York action and the order issued in that case is set forth in this court's order granting CTC's motion to dissolve that order and denying Bell's motion for a permanent injunction. Decision on Motion to Dissolve TRO, etc. at 1–2, 16–17, 19–20, 25–26.

It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal. *Eastman Kodak*, 504 U.S. at 483 n. 32, 112 S.Ct. 2072. "[A] monopolist's unilateral refusal to deal with its competitors (as long as the refusal harms the competitive process) may constitute prima facie evidence of exclusionary conduct in the context of a [Sherman Act] claim." *Data Gen. Corp.*, 36 F.3d at 1183. Bell argues, quoting IIIA P. Areeda & H. Hovencamp, *Antitrust Law* § 765b2 (1996) at 101, that "[i]n all cases where a rival challenges a unilateral refusal to deal under § 2 [of the Sherman Act], 'essentiality' both must be the minimum condition under which the duty will be imposed and must define the scope of the duty." Bell's Reply at 11. From this platform, Bell moves to an assertion that CTC has "abandoned any claim that what it has sought is essential," *id.* at 12, and therefore that CTC cannot recover on its antitrust claim, at least as to the three specified claims.

■ The First Circuit, however, has not adopted Bell's premise. In *Data Gen. Corp.*, the First Circuit concluded that "[i]t is not entirely clear" whether the Supreme Court has created "a category of refusal-to-deal cases different from the essential facilities category" or whether the Court has invited "the application of more general principles of antitrust analysis to unilateral refusals to deal." 36 F.3d at 1183–84. The First Circuit in that case "assumed" the latter—that an antitrust plaintiff need not tailor its argument to an essential facilities category of refusal-to-deal antitrust claims. *Id.* at 1184. Given the First Circuit's current position on this issue, it appears that it is not necessary that CTC either allege or prove that each of the services involved in its specific claims is an essential facility before it may proceed against Bell on its claims of refusal to deal.

Even if the First Circuit had concluded that in every case in which a plaintiff alleged refusal to deal as the basis for an allegation of antitrust violation the plaintiff must first establish that the monopolist defendant has refused to make available an essential facility, Bell's assertion that CTC has abandoned any claim that the services it denied to CTC were essential is incorrect. No such abandonment is apparent in CTC's Opposition, where CTC only argues that "[o]ne need not apply the essential facilities doctrine" under the circumstances. CTC's Opposition at 34. Bell argues that its voice mail cannot be an essential facility because its "market share is in the single digits;" that its Business Link credits cannot be an essential facility because they are available to resellers under certain circumstances, although it provides no evidentiary support for this assertion;[22] and that CTC's complaint about access to Bell's technical support personnel is "solely a complaint that they cannot call the personnel directly, but rather have to go through the Bell Atlantic wholesale account manager dedicated to CTC." Bell's Reply at 12 n. 13.

I have already addressed Bell's evidence concerning market share for its voice mail, and my conclusion regarding CTC's evidence of the effect on the relevant market of Bell's practice in this regard is relevant here. Given the volume of business users found by CTC's expert witness that choose not to switch to resellers for any service when Bell's voice mail will be unavailable as a consequence of the switch, CTC can make a sufficient showing that Bell voice mail is an essential facility for purposes of its antitrust claims to avoid the entry of

---

22. Bell's SMF includes a paragraph concerning Business Link customers and the use and availability of credits under this program, Bell's SMF at 13 [¶ 2], but it provides no citation to the summary judgment record to support the factual assertions it contains and thus may not be considered in support of its motion for summary judgment. *See Pew v. Scopino*, 161 F.R.D. 1, 1 (D.Me.1995); *Donnell v. United States*, 834 F.Supp. 19, 21 n. 1 (D.Me.1993).

summary judgment against it, if such a showing is necessary. It is not necessary to discuss Bell's argument concerning Business Link credits in this context, given the lack of appropriate evidentiary support in the summary judgment record. Bell's argument concerning the lack of direct access to support personnel does not address the status of such personnel as an essential facility. Bell supports its argument on this claim with a citation to *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996), and a district court case that relies on *Ideal Dairy*. I have previously noted that the Third Circuit in *Ideal Dairy* reached without discussion a conclusion that I find to be inconsistent with Supreme Court precedent. Rec. Dec. at 22–23. I continue to find *Ideal Dairy* to be unpersuasive.

Accordingly, Bell is not entitled to summary judgment on any portion of Count II on the basis of a lack of evidence of failure to deal.

### C. Claims Under the Telecommunications Act (Count V–1)

Any claims raised in Count V–1 concerning Bell's voice mail have been dismissed. Affirming Order at 2. As to the remaining claims asserted by CTC under the Telecommunications Act, Bell argues in conclusory fashion that it is entitled to summary judgment under the filed rate and primary jurisdiction doctrines, for the same reasons set forth in its argument concerning CTC's antitrust claims, and that "CTC has failed to establish that any of the practices of which it complains constitute unreasonable or discriminatory limitations on the resale of its telecommunications services." Motion for Summary Judgment at 36. CTC, in similarly brief fashion, argues that it has established violations of the Telecommunications Act "for the reasons identified above." CTC's Opposition at 36.

CTC's First Amended Complaint alleges violations of 47 U.S.C. § 251, which is the portion of the Telecommunications Act of 1996 that, *inter alia*, establishes the duties of local exchange carriers and incumbent local exchange carriers with respect to resale of telecommunications services. Section 251 provides, in relevant part:

**(b) Obligations of all local exchange carriers**

Each local exchange carrier has the following duties:

**(1) Resale**

The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

\* \* \* \* \* \*

**(c) Additional obligations of incumbent local exchange carriers**

\* \* \* \* \* \*

**(4) Resale**

The duty—

**(A)** to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

**(B)** not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service. . . .

My research has located no reported decisions interpreting these provisions of the Act in disputes between carriers, or between carriers and resellers. While the objectives and provisions of the Act are quite different from those of the Sherman Antitrust Act, I am therefore constrained by the presentations of the parties to extend my conclusions concerning the antitrust claims raised in this action to the claims raised in Count V–1 as well. Accordingly, for the reasons set forth above, Bell is not entitled to summary judgment on the remaining claims set forth in Count V–1 of the First Amended Complaint.

## IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion for summary judgment be **GRANTED** as to any claims in Count I arising out of the provision in the Agency Agreement for a separation payment in the event of elimination of the defendant's third-party marketing channel, as set forth in Paragraph 51 of the First Amended Complaint, and as to any antitrust claims arising out of Paragraphs 41(c) and 56(e) in the First Amended Complaint, and otherwise **DENIED.** I also recommend that the plaintiff's implied motion to dismiss claims raised in Paragraphs 41(i), 56(m) and 86(j) of the First Amended Complaint be **GRANTED.**

## NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Nov. 19, 1998.